WILLIAMS, J.
1 ¡MM. appeals a juvenile court judgment, adjudicating four of her five children, W.M., O.M., M.M. and M.M., in need of care and removing them from her custody. For the following reasons, we affirm.
FACTS
M.M. (“the mother”) is the mother of five boys: L.M., born May 3, 1993; W.M., born December 29, 1998; O.M., born June *521 3, 2004; and twins, M.M. and M.M., born June 28, 2007. The children were fathered by three different men; the mother was never married to any of the men. On July 22, 2009, the Department of Children and Family Services, Office of Community Services, Parish of Franklin (“OCS”) received a report that the children did not have adequate food and shelter and that the mother sold the family’s “food stamps” to get money to play bingo.[1] The report was | Sinvestigated and validated. The investigation revealed that the family had very little food, other than “a few groceries” that had been borrowed from a neighbor. Additionally, when the OCS worker went to the home, the electricity was not in sendee; however, the power was restored before the worker left the residence. The OCS worker noted that there were, piles of trash, dirty diapers and laundry all over the home; the kitchen floor was dirty and “sticky,” causing her feet to stick to the floor when she walked through it; and, the interior of the home “smelled really, really bad.” The department’s investigation also revealed that the mother was unemployed; however, she received “$1,000-$1500 in cash and $500 in food stamps every month.”[2]
OCS began providing services to the family, such as transportation to and from the grocery store and medical appointments. It also provided the mother with assistance with budgeting the family’s resources. On October 7, 2009, OCS referred the mother to The Center for Children and Family, a nonprofit organization, for additional family services. A therapist, Traci Arender, provided intensive home-based services (“IHBS”) to the family for a period of four weeks. Arender performed a “family assessment” and initiated a “service plan.” In the assessment and service plan, Arender stated:
[The mother] has adequate income, but she is unable to budget causing the family to run out of money and food |4by the end of the month. Collaterals state [the mother] also sells her food stamps for money to play bingo.
[[Image here]]
The children are clothed, but it is questionable about their upkeep. The clothes do not appear to always be clean and it has been stated by [the mother] that the children have gone days without brushing their teeth.
[[Image here]]
The learning environment in the home is low. [The mother] does not appear to keep up with the children’s homework and studying material.
[[Image here]]
It has been observed and mentioned by collaterals that [the mother] sits back and lets [W.M.] take care of the younger children. The disciplinary practices that have been observed are slapping the children on the arm/hand and yelling at them.
*522 [[Image here]]
[The mother] has not been observed bonding (le., hugs, kisses, being affectionate) with her children. [One of the twins] sitting in [the mother’s] lap has been observed. The twins play well with one another and seem to keep themselves busy.... [The mother] has shown her support for [O.M.] by advocating for him at school.and trying to get him more one on one time due to his delays in the classroom. The children appear to have a good relationship with their mother. The children listen to their mother and tend to obey her requests.
[[Image here]]
Over the four-week period, Arender observed that the home continued to have “an odor” and that the mother habitually left open containers of laundry detergent on the floor inside the home within easy reach of the toddlers. Arender also noted “clothes piled up in the corner ... already eaten Rfood [spread around] ... dirty dishes and food from the day or food from last night that was still on the stove ... dirty diapers on the floor[.]” Arender also noted:
[The mother’s] supervision of the children is a concern. The potential harm of the younger children, if not properly supervised, is present. If [the mother] is able to properly supervise the children, then there is no need in the children being removed. [The mother] shows her concern for her children by providing them with what they need and making sure they have what is necessary to survive; but her lack of desire to supervise is of question.
Meanwhile, Regina Goodman, an OCS child welfare specialist, also continued to work with the family. Goodman stated that her attempts to assist the mother with budgeting and managing her household financial obligations were futile. Although Goodman stated that the mother followed up with medical appointments for the children when OCS provided the transportation and she kept food in the house “most of the time,” there were other problems within the family. For example, the children often were not dressed appropriately for school and doctor’s appointments. Goodman noted that the elementary school called OCS on occasions when it was unable to reach the mother. O.M. frequently urinated and/or defecated on himself at school, and often would not have clean clothing to change into; on one occasion, O.M. returned to school with the same soiled clothing that had |(jbeen sent home the day before. Goodman also reported one incident in which the school called her because O.M. had gone to school wearing no underwear, dressed in pants that would not button or zip. Goodman also reported that one day, O.M. was seen' walking to school in the rain; a man, who was unknown to O.M., stopped his vehicle and transported the child to school.[3] Furthermore, W.M. (age 11) and O.M. (age 5) were frequently absent from school. Goodman also noted that on at least one occasion, there was a three-day delay in having a prescription filled for O.M.’s medication to treat a serious scalp condition.
OCS further noted that the mother had moved three times during the eight-month period that the department worked with her, and that she had “a history of moving from place to place and not paying her rent.” After one such move, the mother failed to notify OCS that she was moving, *523 and the department lost contact with the family. Goodman testified that the mother made at least one attempt to avoid OCS by not answering the door when one of the OCS workers visited. Although the family moved frequently, OCS observed that the family’s living conditions never improved, noting:
The housing condition has been the same in every home, piles of dirty dishes all over the kitchen, dirty diapers open lying on the floor, cleaning supplies on the ground, piles of dirty clothes all over the home, piles of trash and dirt in the middle of every room. The house has' a foul odor that can be smelled before you go in the house.
|7The department’s efforts to work with the mother soon deteriorated.. On January 7, 2010, the Franklin Parish District Attorney’s Office filed a petition in juvenile court, alleging that there was a “deterioration of the case plan as very little progress has been made in the past four months due to the minimal cooperation from [the mother], her failure to provide adequate food and shelter, her failure to provide adequate supervision, [and] her failure to provide adequate education and medical care[.]” The petition did not contain a request to have the children adjudicated in need of care. The mother was served with a copy of the petition and a “Notice of Filing/Fixing.” [4]
A hearing was held on January 13, 2010, and the mother, W.S. (the natural father of W.M. and O.M.) and R.M. (the natural father of M.M. and M.M.) appeared at the hearing.[5] Goodman was the sole witness to testify. Goodman testified with regards to the services that had been offered to the mother and informed the court that there had been “minimal progress” and cooperation from the mother since OCS had been working with the family. The mother and both fathers, who were not represented by counsel at that time, declined to comment. The following exchange occurred between the court and the mother:
COURT: [I will] order that these services be accepted and that you cooperate with OCS because they are simply trying to help you, you know, provide your kids with a|Rsafe and healthy and wholesome environment. So, will you tell me — and will all three of you tell me that you’re going to work with OCS to try to improve the situation with the children. Will you tell me that ma'am?
[MOTHER]: Yes, sir. I will.
COURT: Okay. Now, tell me what you plan to do so that they will be able to work with you?
[MOTHER]: I plan to do what she asks of me — and when she comes back — I mean, if there’s something that I need to do that I’m not doing, for my kids sake.
COURT: Okay. Do you recognize the fact that there are some problems that you can improve?
[MOTHER]: Yes, sir.
COURT: Okay. And you’re going to do that?
[MOTHER]: Yes, sir. To my fullest.
Following the hearing, the court issued a ruling, ordering the mother to allow OCS *524 “to provide [the mother] with Family Services and [to] cooperate with the Office of Community Services, participate in the services offered, follow the recommendations of evaluations and work toward completing all areas addressed in the case plan.”
On March 2, 2010, the court ordered CASA to appoint a volunteer “to represent the best interests of the children) involved in this proceeding^]” In accordance with the order, a CASA volunteer was appointed. The [9volunteer visited the home on March 15, 2010. Following the visit, the volunteer notified OCS as follows:
I went by [the mother’s] home yesterday. ... I smelled the odor when I opened my car door. There was trash everywhere. It smelled like rotten food was in that house. I looked in all the rooms and there was trash and dirty clothes everywhere in the rooms.
The kitchen was absolutely filthy.
I couldn’t stay in that house long. I made a circle through and came out the front door. I handed her the information sheet on the outside of the house and we spoke there because I couldn’t stand it one minute longer. The smell was so bad I became physically ill.
Those kids need to be placed in a healthier environment. I would not let a dog live like that.
(Emphasis in original).
The mother continued to be noncompli-ant with the OCS case plan. In addition to the existing issues with the family, OCS received a report that the mother was leaving the children home alone “while she was playing bingo in West Monroe.” It was also reported that the mother had been observed “punching [W.M. and O.M.] with her fist as punishment.”
On March 25, 2010, the district attorney filed an instanter order, seeking to have all five of the children removed from the custody of the mother. The petition alleged that the children were “in need of care, abused 11flor neglected, that reasonable efforts have been made by the department to prevent or eliminate the need for the children’s removal to no avail[.]” The petition further alleged that it was “necessary to take the children into custody for their protection, and it is for the best interest of the minor children” to place them in the department’s temporary custody. Following a hearing, an order was issued, and the children were placed in OCS custody. On March 29, 2010, the court issued an order, continuing W.M., O.M., M.M. and M.M. in OCS custody; custody of L.M. was returned to the mother.
On April 26, 2010, the district attorney filed a petition, alleging that W.M., O.M., M.M. and M.M. were “children in need of care.” The petition alleged that the mother was unable to provide for the children’s basic needs and prayed that “custody of said children be granted to [OCS] due to the consistent acts of neglect and abuse[.]” The petition also alleged various specific facts, acts or omissions of the mother that had caused or contributed to the children’s condition. The petition was amended on May 28, 2010 and June 2, 2010 to include a prayer that the children be adjudicated as children in need of care. The mother and the natural fathers were served with the original petition, the amended petitions and notice.
_JjjAn adjudication hearing was held on June 2, 2010. All parties, including the fathers, were represented by counsel. During the hearing, counsel for the mother raised an exception of no cause of action with regards to the truancy issue; he also urged an oral motion in limine, seeking to exclude evidence concerning the children’s school attendance. The trial court overruled the exception and denied the motion.
*525 The pertinent testimony adduced at the adjudication hearing is summarized as follows:
The mother was the first witness to testify; she generally denied the allegations of neglect/abuse. She testified that she dropped out of high school after completing the 11th grade and never obtained a GED; however, she completed the training to become a certified nursing assistant (“CNA”). She stated that she had been a CNA since 1999, but had not worked since June or July 2009. The mother also testified that on the day of the initial OCS visit, the only food in her home was “two, three packs of meat in there maybe. It wasn’t enough.” She stated that she was planning to feed herself and her children by asking a friend to bring them food. The mother admitted that there was no stove in the home, but she stated that she prepared meals by using an electric skillet, hot plate or microwave. She also admitted that the electricity in her home and been disconnected prior to the arrival of the |12OCS worker, but her services were restored the same day. The mother explained that her home was in disarray that particular day because she was in the process of packing to move and the home had no closets. However, she admitted that dirty diapers were often left on the floor. When questioned about dirty diapers on the floor, she stated:
[WJhen I’d like change their diapers or whatever ask somebody to take them— ask one of my sons to take them,out or whatever they didn’t ever make it out or — and we had a trash bag on the floor for the diapers it would miss, you know, they wouldn’t put it in there, it would be on the floor.
The mother also admitted that her home had a foul odor, stating, “Because I had two bed wetters ... and they wet everywhere they lay.” She testified that every home she has lived in has had the same odor because of “the saturation of the urine inside by furniture and stuff.” She also admitted that she left cleaning solution, cigarettes and medicine within reach of the children. However, she denied leaving rotten food and dirty dishes in the kitchen. • During her testimony about the uncleanliness of her home, the mother stated:
I am not the cleanest person in the world but I mean if I sweep or whatever with my — with me and my kids it doesn’t stay like that because when we use something we just put it down instead of taking it to the trash or whatever so yes, it has been — it’s been pretty bad. The cleaning is hard.
| isThe mother also testified that she played bingo “three, four times a week” and spent approximately “$25, $30 a week” to play. The mother admitted that when she played bingo, she would leave the children in the care of 17-year-old L.M.; she also admitted that she was aware that L.M. would leave the younger children home alone, with the 11-year-old in charge of the younger children. The mother further admitted ' that she was aware that W.M. and O.M. were frequently tardy or absent from school; however, she blamed O.M. for many of his unexcused absences, stating that he failed to turn in his doctors’ excuses. She stated that she did not accompany the children to the bus stop, nor did she watch them from the doorway to make sure that they got on the bus. She explained that one of her neighbors would be at the bus stop and it was “understood” that the neighbor would see to the children getting on the bus.
Sharon Tillman, the children’s CASA volunteer, also testified. Tillman stated that she visited the home on March 15, 2010, and she could smell the “awful” odor coming from the house as soon as she *526 opened her car door. Tillman stated that the odor was so offensive that she became physically ill, but the mother seemed unaffected by the smell and "acted as if this was a normal thing.” She described the house as a “maze,” stating that there were piles of trash, dirty clothes, dirty diapers and other items on the | Mfloor throughout the house. Tillman opined that the condition of the home posed a health risk to the children.
Arender also testified at the hearing. She stated that the mother’s parental capabilities did not improve during the time she worked with the family. Arender testified that W.M., the 11-year-old boy, provided more care for the twins than the mother provided. She stated that she had observed W.M. getting food for the younger children and/or sharing his food with them. Arender also stated that one of the twins had undergone several heart surgeries and opined that it was not safe for him to live in a home with such unsanitary conditions. Arender further testified that the mother did not have any physical or mental limitations that prevented her from caring for her children, “besides her not actually getting up and wanting to provide for them or doing things for them.” Aren-der described the children as “unkept” and “dirty,” and described the unclean condition of the home and the offensive odor, stating that the home was the “worst” she had ever witnessed.
Shirley Jones, the mother’s aunt also testified. Jones stated that when she visited the family’s home, “there was an odor there and the house could have been cleaned up.” Jones stated that the food bank at her church often donated food to the mother and children.
11BGoodman also testified. She stated that she had visited the family approximately 25 to 30 times over a seven-month period, and the family moved at least five times during that period. She stated that despite efforts to work with the mother, the cleanliness and smell of the home never improved. Goodman also testified that during one visit, she pointed out several hazards to the mother, including cleaning supplies, bottles of medication and dirty diapers filled with feces on the floor. When Goodman returned three days later, the same items were still on the floor. Goodman opined that removing the children from the home was necessary because the condition of the home had not improved and, in fact, “was getting worse.” She also opined that the uncleanliness of the home constituted a health threat to all of the children. Goodman also testified that she provided transportation for the family when the children had doctors’ appointments, and on many occasions, she picked the family up and discovered that the children had not eaten that day. Additionally, Goodman testified that O.M., the five-year-old child, had 20 unexcused absences from school and was tardy 20 days from September until January, and W.M., the 11-year-old, had 23 unexcused absences and was tardy 12 times.
Goodman also testified that the mother had not complied with the case plan. She stated that the mother failed to attend a gambling assessment, and |1fionly attended one-half of the scheduled parenting classes. When asked why removing the children from the mother’s custody was recommended, Goodman responded:
[W]ell, the problem was continuing, it was not getting any better, matter of act, it was getting worse. CASA was having a hard time getting in touch with her. I was having a hard time getting in touch with her. I went and visited one day and knocked and knocked and knocked and she never answered the door. But it was time for [O.M.J to get off the school bus, so I just kind of hung *527 around and waited and he walked up to the door and she opened it. But the house just kept on getting worse and the pill bottles were still there, the dirty diapers were there, she said in the last house I didn’t give her an opportunity, she had just moved, to get everything organized. This was an ongoing problem for seven months, it wasn’t just ‘this house, I just moved, I can’t get it together.’ And she and I talked numerous times about the condition of the house, the medical needs of the children and how they needed to live in a clean sanitary environment and how two year olds get into stuff and if they drink cleaner or take pills or spray cleaner in each other’s eyes, there could be long lasting effects.
[[Image here]]
[T]he twins especially when I would come there some times their diaper would be sagging between their knees and — we went to several doctor’s appointments and I’d say ... ‘his shirt’s really dirty,’ and she took it off, turned it inside out and put it back on him. Brought him out to the van and I could smell him, I said ‘Has he got [sic] a dirty diaper?’ ‘Oh, yes, I guess I need to change that.’ I mean it was — it was bad[J
Goodman also testified that the mother had adequate financial resources to provide for her children’s basic needs, but she was not doing so.
117Pamela Caston also testified at the hearing. Caston stated that she had previously worked at a daycare center with the mother. Caston stated that W.M., O.M., M.M. and M.M. came to the daycare with the mother at least “two or three days out of a week.” According to Caston, she had observed the mother hitting O.M. “in the head and back” as a punishment for urinating on himself. Caston also testified that the children were always dirty and smelled of urine. She also stated that the children would be hungry, and when other employees would ask the mother what her children were going to eat, the mother would respond, “Air sandwiches.”
At the conclusion of the hearing, the court adjudicated W.M., O.M., M.M. and M.M. children in need of care. The court stated:
[W]e’re not a third world country; we do not require children to live in a dumpster. It is obvious to me that you are not caring for these children; they’re caring for you. That’s the picture I’m seeing here.- They are your source of income, virtually all of your income is from your children. They are taking care of themselves. [W.M.] and the oldest are raising the twins and [O.M.]. That’s not the way it’s supposed to be. You’re supposed to be the care giver, not the care taker. And all I’m seeing you do, [Ms. M.], is take. If somebody doesn’t do it for you, it doesn’t get done. If somebody doesn’t get your child to school or get your child to the doctor or get your groceries on the table, it’s not happening because you’re not going to do it. And that places those children in danger[.]
|is0n July 6, 2010, the mother filed a “Predisposition Statement and Objections to Case Plan.” She raised various due process issues pertaining to the January 2010 petition. She argued that the petition failed to include a prayer that the children be adjudicated in need of care; the “notice” included with the petition failed to accurately inform the mother of her rights; and the petition failed to inform the mother that she had the right to an attorney at the proceedings. Notably, the mother did not object to the petition filed April 26, *528 2010, which actually resulted in her children being adjudicated in need of care.
A disposition hearing was held on July 21, 2010. At the conclusion of the hearing, the trial court rendered an order, continuing W;M. and O.M. in OCS custody in the care of relatives. The court granted custody and legal guardianship of the twins, M.M. and M.M., to their natural father.[6]
The mother appeals.
DISCUSSION

No Cause of Action

The mother contends the trial court erred in overruling her exception of no cause of action on the issue of truancy. She argues that the Child in Need of Care provisions of the Children’s Code do not pertain to truancy. She argues that truancy is actionable under Title VII of the Children’s Code, 11flwhich deals with Families in Need of Sendees (“FINS”), and no FINS action was filed in this case.
The function of the peremptory exception of no cause of action is to question whether the law extends a remedy to anyone under the factual allegations of the petition. Kinchen v. Livingston Parish Council, 2007-0478 (La.10/16/07), 967 So.2d 1137; Fink v. Bryant, 2001-0987 (La.11/28/01), 801 So.2d 346. The peremptory exception of no cause of action is designed to test the legal sufficiency of the petition by determining whether the plaintiff is afforded a remedy in law based on the facts alleged in the pleading. Id.
In the instant case, the state did not seek to have W.M., O.M., M.M. and M.M. adjudicated in need of care on the basis of truancy. The petition sought to adjudicate the children in need of care based on “consistent acts of neglect and abuse.” The petition contained sufficient allegations, detailing alleged instances of child neglect and/or abuse. Thus, the petition was sufficient to assert a cause of action for an adjudication that the children were in need of care. This assignment lacks merit.

Motion in Limine

The mother also contends the court erred in denying her motion in limine to exclude evidence of truancy. On the morning of the hearing, the |2nmother’s counsel orally urged a motion in limine “to restrict the admission of the school records pertaining to truancy[.]”
A motion in limine presents an evidentiary matter that is subject to the great discretion of the trial court. Heller v. Nobel Insurance Group, 2000-0261 (La.2/2/00), 753 So.2d 841; Taylor v. Dowling Gosslee & Associates, Inc., 44,654 (La.App.2d Cir.10/7/09), 22 So.3d 246, writ denied, 2009-2420 (La.2/5/10), 27 So.3d 299. This great discretion extends to the trial court’s assessment of the probative value of evidence. Taylor, supra; Given v. Claiborne Elec. Co-op., Inc., 28,408 (La.App.2d Cir.6/26/96), 677 So.2d 635. Relevant evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, misleading the jury, undue delay, or waste of time. LSA-C.E. art. 403.
After reviewing the record, we find that the trial court did not abuse its great discretion in allowing the children’s school attendance records to be admitted into evidence. Much of the testimony centered *529 around the mother’s consistent acts of child neglect. The school attendance records were introduced into evidence as one example of the mother’s attitude toward the care and well-being of her children. We find that the records were relevant, and that the probative value of the records substantially outweighed any |2iperceived danger of unfair prejudice to the mother. Therefore, we cannot say that the trial court’s denial of the motion in limine constituted an abuse of discretion or prejudice. This assignment is without merit.

Judgment of Adjudication

Next, the mother contends the juvenile court erred in adjudicating W.M., O.M., M.M. and M.M. children in need of care. She argues that there was no proof that the children were physically, mentally or sexually abused. The mother also argues that she provided adequate food for the children, and there is no evidence that the children suffered any harm as a result of inadequate clothing or the uncleanliness and foul odor of the home.
As a threshold matter, we note that this matter does not involve the issue of whether W.M., O.M., M.M. and M.M. should be permanently removed from the mother’s custody by termination of her parental rights. Rather, the issue presented is whether reasonable grounds existed to believe that it was in the best interests of the children to be adjudicated children in need of care and to be removed from the physical custody of their mother.
The purpose of Title VI of the Children’s Code, entitled “Child in Need of Care” and applicable to these proceedings, is “to protect children whose physical or mental health and welfare is substantially at risk of harm by physical abuse, neglect, or exploitation and who may be further | ^threatened by the conduct of others[.]” LSA-Ch.C. art. 601. Furthermore, “the health, safety and best interest of the child shall be the paramount concern in all proceedings under [Title VI].” Id. LSA-Ch.C. art. 606 sets forth the grounds on which a child can be adjudicated in need of care, and provides, in pertinent part:
A. Allegations that a child is in need of care must assert one or more of the following grounds:
(1) The child is the victim of abuse perpetrated, aided, or tolerated by the parent or caretaker ... and his welfare is seriously endangered if he is left within the custody or control of that parent or caretaker.
(2) The child is a victim' of neglect.
(3) The child is without necessary food, clothing, shelter, medical care, or supervision because of the disappearance or prolonged absence of his parent or when, for any other reason, the child is placed at substantial risk of imminent harm because of the continuing absence of the parent.
[[Image here]]
LSÁ-Ch.C. art. 603(1) provides, in pertinent part:
“Abuse” means any one of the following acts which seriously endanger the physical, mental, or emotional health and safety of the child:
(a) The infliction, attempted infliction, or, as a result of inadequate supervision, the allowance of the infliction or attempted infliction of physical or mental injury upon the child by a parent or any other person.
[[Image here]]
LaLSA-Ch.C. art. 603(16) provides, in pertinent part:
“Neglect” means the refusal or unreasonable failure of a parent or caretaker to supply the child with necessary food, clothing, shelter, care, treatment, or *530 counseling for any injury, illness, or condition of the child, as a result of which the child’s physical, mental, or emotional health and safety is substantially threatened or impaired. Neglect includes prenatal neglect. Consistent with Article 606(B), the inability of a parent or caretaker to provide for a child due to inadequate financial resources shall not, for that reason alone, be considered neglect!.]
Adjudication of a child in need of care is warranted when a parent shows a repeated pattern of placing a child at risk and exposing a child to a lack of adequate shelter. State in the Interest of A.R., 99-0813 (La.App. 1st Cir.9/24/99), 754 So.2d 1073. At the adjudication hearing, the state bears the burden of proving by a preponderance of the evidence that the child is a child in need of care. LSA-Ch.C. art. 665; State in the Interest of L.B., 2008-1539 (La.7/17/08), 986 So.2d 62; State in the Interest of J.K., 33,878 (La.App.2d Cir.6/23/00), 764 So.2d 287, writ denied, 2000-2637 (La.10/6/00), 771 So.2d 83. It is not the duty of OCS to prove its case beyond a reasonable doubt, by clear and convincing evidence, or to disprove every hypothésis of innocence. State in the Interest of L.B., supra; State in the Interest of J.K, supra.
It is well settled that an appellate court cannot set aside a juvenile court’s findings of fact in the absence of manifest error or unless those findings are clearly wrong. In re A.J.F., 2000-0948 (La.6/30/00), 764 So.2d 47. In a manifest error review, it is important that the appellate court not substitute its own opinion when it is the juvenile court that is in the unique position to see and hear the witnesses as they testify. Id. Where there is conflicting testimony, reasonable evaluations of credibility and reasonable inferences of fact should not be disturbed upon review, even when the appellate court may feel that its own evaluations and inferences are as reasonable as those of the juvenile court. Id.; See also Rosell v. ESCO, 549 So.2d 840 (La.1989). If the juvenile court’s findings are reasonable in light of the record reviewed in its entirety, the appellate court may not reverse, even though convinced that had it been sitting as the trier of fact, it would have weighed the evidence differently. In re A.J.F., supra; See also Pinsonneault v. Merchants & Farmers Bank & Trust Co., 2001-2217 (La.4/3/02), 816 So.2d 270.
In the instant case, the juvenile court heard the testimony of various fact witnesses regarding the mother’s history and the circumstances surrounding the state’s decision to seek to request an adjudication that the children were in need of care. This case presents a unique set of facts. As the [2smother pointed out, the children were provided with basic shelter, in that the roof and the windows of the house were intact. However, after reviewing the record in this case, we find that the mother’s implication — that, in order to avoid a finding of neglect, a parent need only provide children with a roof, windows and functioning utilities — is flawed.
In State in the Interest of JA, 99-2905 (La.1/12/00), 752 So.2d 806, the Supreme Court stated:
The Legislature defined a “neglected” child in broad terms precisely because foreseeing all the possible factual situations that may arise is impossible. Further, the broad definition enables experienced juvenile courts to apply their training and experience to the unique facts and circumstances of each case.
The inquiry into whether the children herein had a house to live in has never been the primary issue. The concern arose due to the alarming living conditions within the home, i.e., the lack of personal *531 hygiene and clean clothing for the children, the lack of sufficient food and supervision, the uncleanliness of the home, and the odor permeating in and around the home. The. mother admitted that, at times, she did not have food to feed her children and that she either “borrowed” food from others or depended on friends to supply food. She also admitted that her home was unclean and had an odor, but expressed little desire to improve the children’s living 12fiConditions, stating, “Cleaning is hard.” Additionally, .the record is replete with incidents in which the mother exhibited a complete disregard for the conditions in which she and her children were living and for the well-being of her children. The OCS worker testified that even when the department provided transportation for the family members to attend doctors’ appointments, the mother would often fail to feed the children before leaving the house and failed to make sure the children were bathed and dressed appropriately, in clean clothing, even after being told by an OCS employee to do so. Moreover, the mother showed little interest in complying with the case plan in that she refused to improve the cleanliness of the house, attended only three out of six of the scheduled parenting classes, moved without informing OCS, and attempted to elude one of the OCS workers when the worker tried to conduct a visit to the home. The mother also seemed unconcerned by the fact that both W.M. and O.M. were absent from school more than 20 days between September and January of the 2009-2010 school year. Additionally, the record reveals that the mother failed to supervise her children, relied on the older children to care for the younger children, and she relied on others to transport the children to school and medical appointments and to obtain food for the household. Furthermore, the evidence revealed that the mother was provided with extensive family |27services for several months, and made little improvement in caring for her children or her home. We find that the record supports a conclusion that the mother refused or failed “to supply the children with necessary food, clothing, shelter, [and] care,” and the children’s “physical, mental, or emotional health and safety [was] substantially threatened or impaired” as a result of the mother’s actions/inactions. Accordingly, we find no manifest error in the juvenile court’s findings of fact or its conclusion that these children were in need of care.

Disposition

The mother also contends the juvenile court erred in removing the children from her custody. In the alternative, the mother contends the court erred in removing W.M. and O.M. from her custody.
LSA-Ch.C. art. 681 provides:
A. In a case in which a child has been adjudicated to be in need of care, the child’s health and safety shall be the paramount concern, and the court may:
(1) Place the child in the custody of a parent or such other suitable person on such terms and conditions as deemed in the best interest of the child including but not limited to the issuance of a protective order pursuant to Article 618.
(2) Place the child in the custody of a private or public institution or .agency.
|⅞¾(3) Commit a child found to be mentally ill to a public or private mental institution or institution for the mentally ill.
(4) Grant guardianship of the child to any individual.
(5) Make such other disposition or combination of the above dispositions as the court deems to be in the best interest of the child.
*532 [[Image here]]
The trial court’s determination concerning the placement of a child in need of care is entitled to great weight and will not be reversed on appeal absent an abuse of discretion. State ex rel. W.T., 35,289 (La.App.2d Cir.8/14/01), 795 So.2d 414, writ denied, 2001-2738 (La.10/26/01), 799 So.2d 1157; State in the Interest of T.H., 561 So.2d 904 (La.App. 2d Cir.1990).
The record herein reveals that M.M. and M.M. were placed in the custody of their father. By placing the children with their father, the juvenile court utilized the first dispositional alternative listed in Article 681. The court found that this placement was in the best interest of the children, and we find no error in the court’s ruling.
With regard to W.M. and O.M., the state recommended that custody be continued with OCS, in the care of relatives, with whom the children had been living since being removed from their mother’s custody. Goodman testified that the children were “better” and that their needs were being met. 12gBased on this record, we find that the trial court was not clearly wrong in concluding that the state’s recommended disposition would presently serve the best interests of the children. Maintaining the children in the custody of OCS will allow the department the opportunity to continue to monitor the children closely and maintain a case plan for the family to ensure that the children’s best interests, safety and protection are being addressed. Consequently, we conclude that the trial court did not abuse its discretion in refusing to return W.M. and O.M. to the custody of the mother.

Case Plan

The mother also contends the trial court erred in adopting the department’s entire case plan. The mother’s objections to portions of the case plan are summarized as follows:
(1) The ease plan requires the mother to “obtain and maintain safe, stable housing.” The mother relied upon child support and government assistance to support herself and her children. Removing the children from her care has resulted in eliminating her means of financial support.
One of the “steps” in obtaining and maintaining “safe, stable . housing” includes requiring the mother to “live in the same home for a minimum of six months.” This requirement interferes with her freedom to live where ever she chooses. Also, since she no longer receives child support and government assistance, she may be forced to move for non-payment of rent.
lsnAnother “step” in providing a “safe, stable home” includes establishing a budget. The unsanitary condition of the home was the primary reason the children were removed. Budgetary issues are unrelated to the condition of the home.
(2) The case plan requires the mother to “maintain her health” and to “follow the recommendations of the medical provider.” Neither the mother’s morbid obesity nor her potential health condition(s) affected her ability to care for her children or maintain her home.
(3) The portion of the case plan, entitled “Day-to-Day Parenting” requires the mother to “assure that [L.M.’s] basic needs of food, clothing, and safe, stable housing are met.” The mother has suffered a significant reduction in income; therefore, it is virtually impossible for her to meet this goal.
Except in extraordinary circumstances, the state must make reasonable efforts to assist parents in removing obstacles to reunification with their children. ■ LSA- *533 Ch.C. art. 672.1; State ex rel. A.T., 2006-0501 (La.7/6/06), 936 So.2d 79. “Reasonable efforts” are defined as “the exercise of ordinary diligence and care by department caseworkers and supervisors and shall assume the availability of a reasonable program of services to children and their families.” LSA-Ch.C. art. 603(17). Among the case plan requirements, LSA-Ch.C. art. 675(B)(2) states that a case plan include services for the parent to “improve the conditions in the parents’ home, facilitate the safe return of the child to his own home[.]” Also, the agency must document the 1 ⅞1 efforts it makes to safely return the child to his home or an alternative safe and permanent placement. LSA-Ch.C. art. 675(B)(3).
We have reviewed the case plan in its entirety. While we acknowledge that some of the requirements of the case plan may be somewhat inconvenient for the mother, we do not find that any of the requirements are unreasonable. The case plan includes the continuation of OCS services, which are designed to improve the conditions of the home and “facilitate the safe return of the [children] to [their] own home.” We do not find it an unreasonable demand to require the mother to meet the basic needs of her children by providing them with “stable housing,” which includes refraining from moving from place to place every few months and establishing a budget to make sure that she can financially support her children. Similarly, it is not unreasonable or overly burdensome to require the mother to “maintain her health.” The mother has four young children, two of whom have serious health conditions. Caring for her young children inherently requires her to care for herself. Further, requiring the mother to meet the basic needs of L.M. was not unreasonable; as his parent, she is required to do so.
We must also address the mother’s insistence that the state has “eliminated” her means of financially supporting her family. The mother [^testified that she is a certified nursing assistant, and that she has worked at nursing facilities and a daycare in the past. She has no known physical or mental condition which would prohibit her from becoming gainfully employed and maintaining a household. The plan states the OCS “will assist [the mother] by providing transportation to search for jobs and housing ... [and] with applications if needed.” We find that none of the requirements imposed on the mother are unreasonable or overly burdensome under the facts of this case. This assignment is, therefore, without merit.

Procedural Objections

The mother has also raised several “due process” arguments regarding the proceedings which took place on January 13, 2010. She argues that the petition filed by the state on January 7, 2010 did not request that the children be adjudicated in need of care. She also argues that the juvenile court: (1) did not inform the mother that the proceedings could affect the custody of her children; (2) did not inform the mother that she had the right to an attorney or that she had the right to answer the petition; and (3) conducted the hearing without appointing an attorney to represent the mother.
In Lassiter v. Dept. of Social Services of Durham County, N.C., 452 U.S. 18, 101 S.Ct. 2153, 68 L.Ed.2d 640 (1981), the State of North Carolina instituted proceedings to terminate an imprisoned mother’s parental rights. |ssThe mother was represented by counsel in the unrelated criminal matter, but was not represented by counsel in the termination proceedings. Thereafter, her parental rights were terminated. She appealed, asserting that because of her indigent status, the Due Process *534 Clause of the Fourteenth Amendment required the state to appoint counsel for her.
The Supreme Court stated:
For all its consequence, “due process” has never been, and perhaps can never be, precisely defined.... [T]he phrase expresses the requirement of “fundamental fairness,” a requirement whose meaning can be as opaque as its importance is lofty. Applying the Due Process Clause is therefore an uncertain enterprise which must discover what “fundamental fairness” consists of in a particular situation by first considering any relevant precedents and then by assessing the several interests that are at stake.
Lassiter, 452 U.S. at 24-25, 101 S.Ct. at 2158 (internal citations omitted). After weighing the mother’s interests against the interests of the government in protecting her child, the Court held that the trial court did not err in failing to appoint counsel to represent the mother.
In the instant case, we find that the juvenile court did not deny the mother due process of law when it did not inform her that she had the right to counsel and did not appoint counsel for her at the January 2010 proceedings. The complaint of child neglect/abuse was validated by OCS in July 2009. Thereafter, the department attempted to provide assistance and services to the family, but the mother refused to cooperate. Thus, OCS was forced to seek judicial intervention. The January 2010 petition did not seek | ^an in need of care adjudication. The goal of that proceeding was to place the mother on notice that the matter was indeed “serious” and that she needed to cooperate with OCS. The mother appeared at the hearing, knowing that the well-being of her children was at issue. She clearly expressed, on the record, her willingness to cooperate with OCS, stating, “[I]f there’s something that I need to do that I’m not doing, for my kids sake. This assignment lacks merit.
CONCLUSION
For the reasons set forth herein, we affirm the juvenile court’s judgment, adjudicating the minors, W.M., O.M., M.M. and M.M., children in need of care. ■ The judgment of disposition, awarding custody of M.M. and M.M. to their natural father, and continuing W.M. and O.M. in the custody of the state, with the authorization to place them in the physical custody of relatives, is likewise affirmed. Costs of this appeal are assessed to the appellant.
AFFIRMED.

. OCS was familiar with the family because the mother had been investigated for neglect in 2007. The agency had also provided services for the family in Richland Parish from October 2007-April 2008 and was aware that two of the children had serious medical conditions (O.M. has a seizure disorder, and one of the twins was born with a congenital heart defect and has undergone three heart surgeries).

. The record reveals that the mother's income was derived from a child support payment in the amount of $542 per month, a social security disability check for one of the twins in the amount of $674 per month and “food stamps” in the amount of $646 per month.

. The mother initially denied that O.M. had ever walked to school in the rain; later, she testified that she knew the man and had paid him to take O.M. to school.

. The notice provided:
YOU ARE HEREBY NOTIFIED that on the 7th day of January, 2010[,] a Petition and Order was filed[,] a certified copy of which is attached hereto and made a part hereof. NOTICE IS HEREBY GIVEN that the above numbered and entitled matter has been fixed for hearing on the 13th day of January, 2010 at 9:30 A.M. in Franklin Parish Courthouse in Winnsboro, Louisiana.
[[Image here]]

. At the time of the proceedings, the mother did not know the whereabouts of L.M.’s natural father to notify him of the proceedings.

. R.M., the father of the twins, testified that he exercised visitation with the twins at his home on weekends. He agreed in open court to accept custody of the twins. W.M. was placed in the care of his maternal aunt; O.M. was placed in the care of his maternal great-aunt. Custody of L.M., age 17 at the time of the hearing, was continued with the mother. The custody of L.M. is not at issue in this appeal.