PITMAN, J.,
concurs.
liOn the application of the State of Louisiana, we granted rehearing in this case to reconsider the opinion of this court affirming the juvenile court’s determination that B.M. is not a child in need of care. I dissented from this court’s original opinion. For the following reasons, I concur with the result in the opinion on rehearing.
FACTS
On December 2, 2015, the State of Louisiana, Department of Child and Family Services (“DCFS”), filed an instanter order and an affidavit in support of the instanter order. In this affidavit, DCFS child protection investigator LaShuñdra Prim explained that, on November 27, 2015, DCFS received a report alleging abuse of a two-year-old' boy, B.M.- The report alleged that B.M.’s parents “lock[ ]” him in a bedroom “90% of the time.” It explained that B.M. and his-parents live in a travel trailer and the room in which B.M. is kept is only large enough to fit a full-size bed. It also stated that B.M.’s parents neglect him by not caring for his hygiene and that B.M. has very poor speech because his parents do not communicate with him. ■
Ms. Prim stated that, on December 1, 2015, she and a Caddo Parish sheriffs deputy went to the home of B.M.’s parents. Marijuana was found inside the trailer, and B.M.’s parents were arrested. B.M.’s mother was- charged with possession of marijuana, -illegal use of a controlled dangerous substance in the presence of a child under. 17 years and prohibited acts—use/possession of drug paraphernalia, B.M.’s father was charged with possession of marijuana— second offense, illegal use of a controlled dangerous substance in the presence of a child under 17 years and prohibited Lacts—use/possession of drug paraphernalia. Following his parents’ .arrest, B.M. was placed with his paternal grandmother and step-grandfather.
The juvenile court issued an instanter order on December 1, 2015, finding that there were reasonable grounds to believe that B.M. was in need of care due to *983 substantial, immediate danger to his health and safety; that removal of B.M. from the home was necessary to safeguard his welfare due to physical abuse/tying or confinement, neglect/lack of adequate supervision, neglect/dependency, neglect/inadequate shelter; that DCFS was deemed to have made reasonable. efforts to prevent or eliminate the need for removal because emergency circumstances exist and there was a substantial, immediate danger to the health, safety and welfare of B.M.; and that preventive services have been offered. The juvenile court ordered that B.M. be placed in the temporary custody of DCFS.
On December 22, 2015, the hearing officer of the juvenile court issued recommendations after considering evidence and arguments made at a hearing. The hearing officer determined that there were reasonable grounds to believe that B.M. was in need of care and that continued custody was necessary for his safety and protection. She granted B.M.’s parents supervised visitation and placed him in the legal custody of his paternal grandmother and step-grandfather. She also ordered DCFS to develop a case plan and forward it to B.M,’s parents.
' On January 12, 2016, the" juvenile court signed a judgmeni/order adopting the recommendations made by the hearing officer and declared the recommendations to be the judgment of the court.
|3In January 2016, DCFS filed a petition seeking to have B.M. adjudicated a child in need of care as defined by La. Ch. C. art. 606, et seq.
On March 7, 2016, DCFS filed a report and a case plan. It stated that the case plan goal is reunification and outlined efforts to achieve that goal. It recommended that B.M. remain in the custody of his paternal grandmother and step-grandfather and that his parents have unsupervised visitation.
An adjudication hearing was held on March 15, 2016. Ms. Prim testified that she became involved in this investigation when DCFS received a report that B.M. had been locked in a room by himself all day and that he was not being well kept. She stated that she contacted law enforcement for an escort to B.M.’s home and then proceeded to the address. When she arrived, she observed that there were two trailers located on the property. She went to the first trailer, where she learned that B.M.’s paternal grandfather and step-grandmother lived there and, that B.M. and his parents resided in the trailer on the back of the property. She stated that, while walking to the travel trailer, she noticed that the ground was wet with sewage, She testified that B.M.’s father answered her knock at the door. She explained to him that she was -there because of an open investigation with child protection pertaining to B.M, and he allowed her to enter the home. She described the interior of the travel trailer and recalled that there were two camper chairs joined together by an ashtray and that there were dishes in the sink. The door to the bedroom was a half door that would prevent a small child from entering or exiting the room. She noted that the bedroom was small and that there was a mattress on the floor.. She testified that, as she began reading the parents the report, the father was arrested for [¿having marijuana in the home. She then picked up B.M. and moved him so that he did not get hurt during the arrest. After both parents were arrested, she contacted B.M.’s paternal grandmother, and B.M. was placed with his paternal grandmother and step-grandfather. She testified that she then visited both parents in jail. B.M.’s father admitted that the marijuana was his, that it did not belong to his wife and that he had never smoked marijuana around B.M- *984 The father submitted to a drug test, which was positive for marijuana. She stated that B.M.’s mother appeared not to know what was going on and was placed in the mental health unit of the jail due to suffering from depression. The mother submitted to a drug test and the results were negative. She stated that B.M. was also tested for drugs and that the test results were negative. She noted that B.M. appeared to be healthy but that there was not enough room in the travel trailer for him to move around.
On cross-examination, Ms. Prim stated that B.M. was not locked in the bedroom when she arrived at the trailer. She testified that B.M. received an examination from a state physician and was declared healthy.
Deputy Mike McConnell of the Caddo Parish Sheriffs Office testified that, on December 1, 2015, he was dispatched to a travel trailer in response to a complaint that a child might be living in severe conditions. He described the travel trailer as 25 feet long by 8 or 9 feet wide. He stated that, when he walked up to the trailer, he noticed—by sight and smell—that there was raw sewage coming out from under the trailer and that there was no way to enter the trailer without walking through the sewage. He testified' that Ms. Prim then came into contact with B.M.’s parents and explained why she |Kwas there, and he and Ms. Prim then entered the trailer. He recalled that the • travel trailer was small and that there was very little room to move around inside. The trailer had no furniture except for two lawn chairs and there were dirty dishes in the sink. He noted the bedroom was small and that it appeared that B.M. slept on a pallet on the floor. He further testified that he noticed B.M.’s father place his cell phone on top of a marijuana cigarette in an attempt to conceal the cigarette. He stated that he seized the- cigarette and then Mirandized B.M.’s parents. Both parents waived their rights, and the father admitted that the marijuana cigarette belonged to him. The father also gave him a plastic bag containing 3.5 grams of marijuana. Dep. McConnell stated that B.M.’s mother told him that she and B.M.’s father had consumed marijuana the day before in the trailer with B.M. present. He testified that B.M.’s parents were then arrested and Ms. Prim took B.M. from the residence.
On cross-examination, Dep. McConnell noted that B.M. was present in the trailer and was clothed in a diaper. He stated that he did not notice any bruises or marks on B.M. and that he looked well taken care of, describing him as a “little chubby little thing.”
B.M.’s paternal grandmother testified that B.M. was currently living with her and her husband (his step-grandfather). She stated that B.M. came to live with them the night his parents were arrested. She described B.M. as being in perfect health with good hygiene and that he did not appear to have been harmed in any way. She noted that she had never visited the travel trailer. She testified that she was not concerned about his safe.ty or well-being if he was returned to his parents.
| (¡On cross-examination, B.M.’s paternal grandmother stated that she does have concerns about drugs being used around B.M. She noted that B.M. and his parents had lived in the travel trailer for approximately nine months and that it was supposed to be temporary housing. She stated that when his parents leave after their visitation, B.M. cries and looks for them.
Following the testimony, DCFS argued that B.M. is a child in need of care, and the attorney for B.M. argued he was not a child in need of care. The juvenile court found that the evidence in this case did not *985 warrant a child-in-need-of-care adjudication. The court explained:
There was a moment, a moment, when the child was in need of care in order to transit from the parents as they were being arrested to [B.M.’s paternal grandmother]; but I don’t find that the evidence in this case warrants a child in need of care adjudication at this time.
I would caution /all that if you have not fixed that sewage problem by this time, [B.M.] needs to not be there. So you need to make sure that [B.M.] stays with [his paternal grandmother] until you have a suitable place for the child to live.
The juvenile court vacated the custody of DCFS and returned custody of B.M. to his parents. It reiterated that B.M.’s parents needed to leave B.M. with his paternal grandmother until they had a “wholesome, appropriate” place for B.M. to live.
DISCUSSION
Title VI of the Louisiana Children’s Code, i.e., La. Ch. C. arts. 601 to 725.3, sets forth the statutes regarding children in need of care. La. Ch. C. art. 601 explains the purpose of Title VI and states:
The purpose of this Title is to protect children whose physical or mental health and welfare is substantially at risk of harm by physical abuse, neglect, or exploitation and who may be further threatened by the conduct of others, by providing for the reporting of suspected cases of abuse, Sexploitation, or neglect of children; by providing for the investigation of such complaints; and by providing, if necessary, for the resolution of child in need of care proceedings in the courts. The proceedings shall be conducted expeditiously to avoid delays in achieving permanency for children. This Title is intended to provide the greatest possible protection as promptly as possible for such children. The health, safety, and best interest of the child shall be the paramount concern in all proceedings under this Title. This Title shall be construed in accordance with Article 102. This Title shall be administered and interpreted to avoid unnecessary interference with family privacy and trauma to the child, and yet, at the same time, authorize the protective and preventive intervention needed for the health, safety, and well-being of children.
(Emphasis added.)
The grounds for finding a child to be in need of care are set forth in La. Ch. C. art. 606. Allegations that a child is in need of care must assert one or more of the grounds. In the case of B.M., it was alleged that he was a victim of neglect. See La. Ch. C. art. 606(A)(2). La. Ch. C. art. 603(18) defines “neglect,” in part, as follows:
“Neglect” means the refusal or unreasonable failure of a parent or caretaker to supply the child with necessary food, clothing, shelter, care, treatment, or counseling for any injury, illness, or condition of the child, as a result of which the child’s physical, mental, or emotional health and safety is substantially threatened or impaired.... Consistent with Article 606(B), the inability of a parent or caretaker to provide for a child due to inadequate financial resources shall not, for that reason alone, be considered neglect.
Adjudication of a child in need of care is warranted when a parent shows a repeated pattern of placing a child at risk and exposing a child to a lack of adequate shelter. State ex rel. L.M., 46,078 (La.App. 2 Cir. 1/26/11), 57 So.3d 518. At the adjudication hearing, the state bears the burden of proving by a preponderance of the evidence that the child is a child in need of *986 care. La. Ch. C. art. 665. It is not the duty of DCFS to | sprove its case beyond a reasonable doubt, by clear and convincing evidence or to disprove every hypothesis of innocence. State ex rel. L.M., supra.
It is well settled that an appellate court cannot set aside a juvenile court’s finding of fact in the absence of manifest error or unless those findings are clearly wrong. State ex rel. L.M., supra.
The physical health, welfare and safety of B.M. were substantially at risk of harm due to the conditions in which he was living while in the custody of his parents. Raw sewage surrounded the entry into the travel trailer, B.M.’s father possessed marijuana inside the travel trailer and B.M.’s mother admitted that she and his father had smoked marijuana when B.M. was present.
The trial court did not adjudicate B.M. a child in need of care, but it admonished B.M.’s parents that B.M. should not return to the travel trailer until the sewage problem was fixed and that B.M. should remain with his paternal grandmother until they had a “wholesome, appropriate” place for B.M. to live. These actions by the juvenile court are inconsistent.[1]
The juvenile court was clearly concerned with B.M.’s living conditions and did not want B.M. to return to a home surrounded by sewage. Although it instructed B.M.’s parents that B.M. should remain with his paternal grandmother until they could provide an appropriate living situation for him, it did not put in place any procedures to ensure that the parents would comply with its admonition. We do not know if the living conditions of B.M. have improved. We do not know if the sewage problem has been [ {¡remediated. We do not know if B.M.’s parents continue to use illegal drugs in his presence.
Therefore,.- the juvenile court should have adjudicated B.M. a child in need of care and implemented available procedures to protect his safety by ensuring that the living situation with his parents improved before returning him to their custody. If parents neglect to provide a safe environment for their child, it is incumbent on our courts with jurisdiction over families to do so.
I agree with this court’s reversal of the juvenile court and determination that B.M. is a child in need of care. I agree that this case be remanded to the juvenile court, ordering, that a safety plan be developed and a disposition hearing held immediately. Further, CASA shall be reappointed to represent the best interests of B.M. This child has been in harm’s way for entirely too long.
Accordingly, I concur in the result of the opinion on rehearing.

. In coming to its decision, the juvenile court considered and accepted the attorney for .B.M.'s argument that B.M. was not a child in need of care. However, the arguments made by B.M.’s attorney were not in B.M.’s best interest.