PITMAN, J.
_JjThe State of Louisiana, Department of Children and Family Services (“DCFS”), appeals a modification of a judgment of disposition in which the trial court granted guardianship to appellees Scott and Christy Fordham. For the following reasons, we affirm.

FACTS

In August 2013, minor half siblings N.C. (a male born on October 10, 2006) and M.G. (a female born on December 29, 2011) came into state care following a report that M.G. suffered cigarette burns on her arms and legs. DCFS placéd the children with certified foster parents, the Fordhams.
On September 18, 2013, the DCFS filed a petition stating that N.C. and M.G. are minor children in need of care, alleging that the children suffered from neglect due to. the actions of their mother abusing drugs on a daily basis.
On September 23, 2013, DCFS filed a motion and order to approve the case plan presented to the juvenile court, stating that N.C. and M.G. had been placed in the custody of DCFS and then placed together with foster parents, i.e., the Fordhams. The plan’s stated primary- goal was reunification with a secondary goal of adoption.
In October 2013, N.C. and M.G. were adjudicated children in need of care. On March 11, 2014, the trial court filed an adjudication/disposition judgment finding that the state proved the allegations of the petition and that the evidence warranted adjudication of children in need of card. It ordered that custody be maintained with DCFS and found it was in the best interest of the children to be removed from the custody of the parents.
|2On June 20, 2014, the trial court filed a permanency hearing/case review judgment. It noted that DCFS made reasonable efforts to prevent removal and to reunify the family, including attempting to locate family members with whom the children could be safely placed and creating a case plan to help the family toward reunification. It ordered that custody be maintained with DCFS, that DCFS and -the *762 parents comply with the case plan, that the parents have the right of supervised visitation and that a, permanency hearing be held every year.
On August 7, 2014, the Fordhams filed a petition to intervene. They noted that N.C. had been placed in a different foster home, while. M.G.-remained in their home. They stated their desire to facilitate M.G.’s permanent placement. They expressed that they are deeply attached to M.G., that she has lived with them for almost one year and that they desire to adopt her if she become^' available for adoption. The trial court granted the Fordhams’ petition to intervene.
On August 18, 2014, DCFS filed a motion and order to approve ease plan. The case plan detailed that N.C. was placed with Debrah Hodgkins, a noncertified relative placement, that M.G. remained with the Fordhams and that the primary goal was reunification .with a secondary goal of adoption. It noted that DCFS completed home studies on the children’s grandmother and three great-aunts.
On September 15, 2Ú14, the Fordhams filed a petition for permanent.legal custody of M.G. They stated that several of the children’s aunts or great-aunts sought to have the children placed with family members. They | .-¡noted that M.G-. has bonded with them, that she has lived with them from the age of 20 months to 82 months and that it would be detrimental to her long-term, emotional well-being if she was removed from- their home. They stated that they prefer to adopt M.G., but sought permanent legal custody out of an abundance of caution..
On September 24, 2014, the trial court filed a permanency hearing/ case review judgment, which stated that custody of N.C. and M.G. was maintained with DCFS and that the goal had changed from reunification to adoption.
On October 21, 2014, the Fordhams filed a motion for provisional legal custody and motion to appoint independent psychologist They alleged that DCFS had begun introducing M.G. to relatives during,supervised visitation times and requested that DCFS be relieved of M.G.’s custody, with provisional custody granted to them.They also requested that the trial court order the children to be examined by a psychologist or psychiatrist to make a recommendation to the court as. to whether it would be in M.G.’s best interest to have her placement with the Fordhams -disrupted.
On January 5, 2015, DCFS filed a petition for involuntary termination of parental rights and certification for adoption.[1]
4On February 15, 2015, the trial court filed an order setting a review hearing, setting a hearing on the motion for provisional legal custody, allowing DCFS to have the children evaluated by Melanie Clark at DCFS’s expense and allowing the Fordhams to have the children evaluated by a mental health care professional at their expense. It noted that the purposes *763 of the evaluations were to help the court evaluate the bond between the siblings, the risk of aggressive behavior by; N.C. toward M.G., whether it would be detrimental to separate the siblings and whether it would be detrimental to M.G. to be separated from the Fordhams.
The trial on the motion for provisional legal custody began on February 19, 2015. Sarah Thompson, a licensed professional counselor and a registered play therapist,[2] testified that N.C. and M.G. were clients of hers and that she met with N.C. for 12 sessions and M.G. for 6 sessions. She noted that she met with N.C. while he lived with the Fordhams; while he lived with a second foster family, the Buxtons; and while he lived with his aunt, Ms. Hodgkins. Ms. Thompson testified that, during the sessions when N.C. lived with the Fordhams, she learned from Mrs. Fordham that N.C. was- aggressive toward M.G., so she recommended that N.C. be placed in a separate foster home. She stated that this recommendation was based on her conversations with Mrs. Fordham, her sessions with N.C. and her conversations with social worker Articia Barker. She noted that Mrs. Fordham mentioned burn marks on M.G., so. she asked N.C. about them. N.C. responded that he accidentally burned M.G. with a long white Robject. Ms. Thompson noted that she did not observe N.C. and M.G. together (and, therefore, did not observe any aggression) and .that N.C. seemed to love M.G., but did not talk about her much. She stated that, after N.C. was moved into a separate foster home, she asked him how he felt about being separated from M.G. He responded that he was sad, but he did hot show any emotion. Ms. Thompson testified that Mrs. Buxton reported concerns about N.C.’s aggressive behavior toward her daughter, i.e., he hit her and pushed her into a shelf.' She stated that, in response, she held a session with N.C. about anger management and that N.C. expressed that he gets angry with his foster sister and that he wanted a- brother instead of a sister. She stated that N.C. seemed to be doing “great” while “happily” living with Ms. Hodgkins. She testified that,, while living with Ms. Hodgkins, N.C. expressed, “We’ve got to get [M.G.] back.” his. Thompson stated. that she believes there would be some detrimental effects from removing M.G. from the Fordhams’ home because she has lived there for over a year and has bonded with them.
Scott Fordham, a lineman for Entergy, testified that he is married to • Christy Fordham and is the foster father of M.G. He stated that M.G. has lived with them since August 2013 and that N.C. lived with them from August 2013 to February 2014. He further stated that he witnessed violence between N.C. and M.G., specifically that N.C. hit M.G. in the face with his fist, and that he heard N.C. “cuss her and holler- at her,” including making a racial slur.[3] He testified that he has developed a love for M-.G. and wants to |fiadopt her. He believes M.G. loves him and stated that she calls him “Daddy.” He admitted that he believed M.G. could have a bond with her family if she had longer visits with them and noted that M.G. and N,C. do have a bond. i
‘ Christy Fordham, a registered nurse for the Ouachita Parish School Board, testified that she became foster mother to M.G. on August 15, 2013.- She noted that, when M.G. came to her care, she had a burn mark on her arm and on her leg, her affect *764 and expression were “flat” and she only-spoke a few words. She stated that M.G.’s personality has changed and is now very entertaining, animated and happy. She further stated that she and her husband doted on both N.C. and M.G., but N.C. seemed jealous of M.G. and was aggressive with her. She noted that she observed claw marks on M.G.’s back after she had been left alone with N.C. and saw him hit and shove her. She also stated that N.C. told her that he accidentally burned M.G. with a long white thing, and she noted that the burns looked like cigarette burns to her. She also stated that she observed N.C.’s and M.G.’s visits with their biological family and noted that N.C. was the center of attention and that some of the family members fussed at M.G. She believes M.G.’s behavior changed after these visits in that she was more aggressive and there were times when she would cling to her leg and cry and say, “Mommy leave me?” She stated that, after a few weeks of living with them, M.G. began to call her “Mommy” and several months later began to call Mr. Fordham “Daddy.” She testified that she loves M.G. and wants to adopt her. She expressed some concerns with M.G. having visitation with her biological 17family and noted that some family members did not pass the DCFS home studies, alleging drug abuse by family members. She discussed her training as a foster parent and her understanding of the case plan’s goal of reunification of the children with their parents. She stated that she was aware that the children could go back to their biological parents, but she did not believe that would happen because the parents were not following the case plan. She testified that M.G. began to respond well to visiting with family members as she has had more exposure to them. She also believes that M.G. needs to have a relationship with N.C. She described her relationship with Ms. Hodg-kins as strained, but improving.
Whitney Ezell testified that she has been M.G.’s preschool teacher for 18 months. She stated that, when M.G. first came to school, she was fairly withdrawn, unemotional and not an active student. She noted great improvement in M.G.’s behavior in that she is now talking, participating, interacting and making friends and has blossomed into a very smart three-year-old. She stated that M.G. had counseling sessions once a month and is not her usual bubbly self following those sessions. She noted that M.G. first referred to the Fordhams by their first names, but, after a few months, began to call them “Mom” and “Dad.”
The trial was continued to March 18, 2015.
On March 12,2015, the Fordhams filed a motion in limine. They stated that DCFS took M.G. for a visit with her aunt, Ms. Hodgkins, from February 27 to March 2, 2015. They noted that DCFS then took M.G. back to Ms. Hodgkins on March 4, 2014, for a seven- to ten-day visit. They | ^stated that, instead of gradually increasing extended visits, DCFS “immersed” M.G. in an attempt to manufacture evidence. They requested that evidence of events occurring after DCFS took M.G. on March 4, 2015, be excluded from evidence.
The trial continued on March 18, 2015. The Fordhams withdrew their motion in limine. The trial was continued to April 15, 2015.
On April 13, 2015, the Fordhams filed a motion to allow psychologist Dr. Sally Thigpen continued access to the children and filed an alternative motion in limine. They stated that, on March 16, 2015, DCFS informed them that it was changing M.G.’s placement and that they would no longer be her foster parents. They al *765 leged that DCFS refused to allow Dr. Thigpen to continue sessions with the children, and they believed that her continued monitoring of the children is in then- best interest. In the alternative, they requested that evidence of events occurring after M.G.’s removal from their physical custody on March 13, 2015, be barred at further hearings on the matter.
The trial continued on April 15, 2015. The trial court first addressed the Ford-hams’ motion to allow Dr. Thigpen continued access to the children and their alternative motion in limine. It stated that it was unaware that M.G. had been removed from the Fordhams’ home, whereupon counsel for DCFS responded that the Fordhams’ home has been closed as a foster home. After a meeting in chambers with the court and all attorneys, counsel for the Fordhams stated that they decided not to have additional sessions for M.G. with Dr. Thigpen. Counsel for DCFS then moved to dismiss the case and Rthe motion for provisional legal custody on the grounds that the Fordhams’ foster home has been closed and that they are, therefore, no longer interested parties to the proceedings and have no standing. Counsel for the Fordhams opposed the motion. The trial court denied the motion because DCFS chose to remove M.G. from the Fordhams’ home, expressing concern with DCFS’s thinking, “I can move them out when I have the ability to do that, I can move the child out and end this case.” It stated that DCFS tried to end the case based on its own actions and not because of the Fordhams’ actions.
Following the rulings on these motions, Dr. Thigpen testified, stating that she has a Ph.D. in psychology with an emphasis in counseling and a specialization in family psychology.[4] She stated that, in April 2014, Mrs. Fordham asked her to consult with her and her husband regarding M.G. She interviewed Mrs. Fordham, observed Mr. and Mrs. Fordham interacting with M.G. and reviewed literature on foster care and the placement of siblings in foster care. She further stated that her first interview with Mrs. Fordham occurred on April 1, 2014, at which Mrs. Fordham detailed the history of fostering N.C. and M.G. She testified that, on April 8, 2014, she observed, the Fordhams'and M.G. together. M.G. would not talk to her and appeared a bit frightened of her, but M.G. did interact with the Fordhams. She noted an indication of some attachment between M.G. and the Fordhams, which actions were characteristic of secure bonding with them. She believed it would be very dangerous to Imdisrupt the bond between the Fordhams and M.G. and stated that it should be done only with the utmost care. She testified that, in November 2014, Mrs. Fordham contacted her again and requested that she perform an evaluation of the family dynamics among the Fordhams and M.G., perform an observation of the family dynamics between M.G. and N.C. and evaluate the “pluses and minuses” of keeping the children together versus separating them. On November 24, 2014, she observed the family dynamics between M.G. and the Fordhams and noted a tremendous amount of change in M.G. in that she was much more self-confident, was willing to talk to her, explored the playroom and was a friendly, happy child. She described M.G. as securely attached to the Fordhams and noted that her age is very much a factor as to developing a primary attachment. She stated that moving M.G. to a different home and disrupting that attachment would definitely not be in her best interest. She further testified that she observed M.G. and N.C. on four occasions. *766 She stated that they had a pleasant relationship with one another and that they engaged more in parallel play than cooperative play, which is expected when a five-year age gap exists between the children. She also stated .that, on the fourth visit, N.C. was very encouraging toward M.G. She testified that N.C. never expressed distress over the absence of M.G. in his life and did not have a particular desire to interact with her, but was glad to see her. She recommended that N.C. and M.G. have continued contact, but opined that the benefits of joint placement were minimal. She further testified that she saw M.G. in March 2015 after D.CFS removed her from the Fordhams’ home to have a four-day visit with Ms. Hodgkins. She In described M.G.’s demeanor as serious, less verbal and less happy and that M.G. said, “I don’t want to live with Aunt Debra” (Ms. Hodg-kins). : She stated that, after this March 2015 visit, DCFS notified her that her services were no longer needed, and she responded to DCFS that the trial court had ordered that she see the children. She stated that DCFS should have made a gradual. transition of allowing M.G. to spend time with Ms. Hodgkins and described the immersion as very inappropriate and potentially traumatic. She also stated that N.C. was doing well living with his aunt and M.G. was doing well living with the Fordhams, so there was no reason to disrupt thé households.
Dr. Meade. O’Boyle testified that she is board certified in pediatrics and as a child abuse pediatrician.[5] She stated that DCFS requested that she see M.G. regarding her placement with Ms. Hodgkins, specifically to determine if M.G. was depressed.[6] Dr. O’Boyle told DCFS that she was not the right person .to determine this and that a psychologist or play- therapist needed, to be involved. She stated that, when she met with M.G. on March 31, 2015, M.G. would not talk to her, but did not seem particularly, sad. .Her report stated that M.G. “is a lively child, she does not appear to be depressed, she appears to be normal.” Dr. O’Boyle testified that some time after she evaluated M.G., Mrs. Fordham approached her at a seminar and asked her to see M.G. She responded that she had already seen M.G. She Instated that Mrs. Fordham called her at work and discussed her concerns about N.C.’s actions toward M.G. She then wrote an addenduna to her report and recpmmended that M.G. receive counseling or play therapy during her transition between homes.
The trial continued on May 8, 2015. During a Watermeier hearing,[7] N.C. testified that he is eight years old. He stated that he lives with his Aunt Debrah and that they get along “good.” He noted that M.G. also lives with them and that they get along “good.” He testified that he wants M.G. to live with him and that they do not argue or fight. He listed the things he and M.G. do together,' including watching *767 television, playing video games and playing outside. N.C. stated that. he loves his sister and that he wants her to live with him and to be able to see her.,
Articia Barker, a Ouachita Parish DCFS employee, testified that she was the foster care worker assigned to M.G.’s and N.C.’s case from November 25,- 2013, to August 1, 2014. She stated that her job duty is to reunite families, rioting ■ that- she meets monthly in the home with" care givers, children and parents. She also stated that the children have family visits outside of the family home approximately twice a month. She testified that, át a scheduled visit with the ■ Fordhams, Mrs. Fordham said everything was fine, but expressed a concern that N.C. was angry and doing mean things to M.G. She stated that, in February 2014, DCFS removed N.C, from the- liaFordhams’ home because of Mrs. Fordham’s reports and counseling reports of N.C.’s behavior. N.C. was then placed with the Buxtons, but he was aggressive toward their daughter. Based on a counseling report, N.C. was then placed with Ms. Hodgkins. ■
Jessica Simpson, a home development worker for DCFS, testified that she "was assigned to complete a home study on Ms. Hodgkins. She stated that Ms. Hodgkins completed-her training classes in August 2014 and submitted an application to be a foster parent in March 2015, which was when she was assigned to the case.. She stated that she set up a home visit with Ms. Hodgkins on March 12, 2015, She spoke with Ms. Hodgkins and had the opportunity to speak with M.G. privately. She recounted that M.G. said she liked living with her aunt and that she was happy. She observed Ms. Hodgkins interact with M.G., and M.G. climbed onto Ms. Hodgkins’s lap and seemed very comfortable with her. She testified that N.C. arrived approximately an hour into the visit after returning from school. M.G. was excited to see her brother and he read a book to her when she asked. She stated that M.G. seemed to have a strong bond with both Ms. Hodgkins, and. N.C. She conducted additional- home visits on March 17, 2015, and April 2, 2015, noting that each time she visited, M.G. was very cheerful and playful and ' seemed like a happy, easy-going child. She testified that she did-not observe anything of concern to her for M.G.’s safety and believes that Ms. Hodgkins will be an excellent foster parent. ...
' Paige Davis, a CASA (Court Appointed Special Advocates) "supervisor, testified that, on January 8, '20l5, the trial court appointed |14CASA to M.G.’s and N.C.’s case. She stated that she met with both children and observed family visits at DCFS and at the homes of the Fordhams and Ms. Hodgkins. She further stated that, although the CASA advocate had not yet made a recommendation, she and the advocate agreed that M.G. and N.C. being together in a relative placement is probably in' M.G.’s best interest. She testified that she does not have any concerns with M.G. being traumatized by her 'removal from the Fordharris’ home, but stated that she would like for a home therapist to work with M.G. and N.C. ’
, Tiffany Majors, a foster care worker with DCFS, testified that she began working on M.G.’s and N.C.’s case on September 15, 2014. In October 2014, she visited the Fordhams’ home to introduce herself as the case worker, to discuss monthly visits and to check on M.G.’s well being. She noted that, on February 27, 2015, M.G. began an extended visit with Ms. Hodgkins. M.G. was excited to.see her brother and did not seem upset, about leaving the Fordhams’ home to spend time with Ms. Hodgkins. She testified that she checked in with Ms. Hodgkins during that *768 visit. A second visit began on March 4, 2015, and was meant to be a seven — to ten-day visit. ■ She stated that M.G. was happy and active at Ms. Hodgkins’s home and that she did not have any concerns about M.G. being there. DCFS then made the decision to place M.G. with Ms. Hodg-kins as a permanent placement, beginning on March 16, 2015. She stated that she believes M.G. is bonded to N.C. and Ms. Hodgkins and acknowledged that M.G. and the Fordhams also have a great bond. She testified that it is DCFS’s recommendation that 11fithe children remain together in Ms. Hodgkins’s home and that Ms. Hodgkins adopt the children once the parents’ rights are terminated.
Debrah Hodgkins testified that M.G. and N.C. are her great-niece and great-nephew and that she lived next door to N.C. for the first three or four years of his life until he moved to Arkansas with his mother. She stated that N.C. has lived with her for nine months and M.G. has lived with her for one month. She has worked for the U.S. Postal Service for 16 years, and her routine work hours are 10 a.m. to 2 p.m. She is not married and has three adult sons. She stated that, in late January or early February 2014, she contacted DCFS to be considered as a placement for the children. She believed that the children’s mother was negligent in raising them, so she felt she should intervene because the children are her family and the family did not want to lose them. She noted that, when the children were placed with nonrelatives, ■ she was able to see them at family visits. She further noted that she was asked by Mrs. Ford-ham, “Would y’all take money to leave the baby alone?” to which she responded no. She testified that her home can accommodate each child with his/her own room and that the children attend school or day care while she is at work. She further testified that she receives no subsidy pay from DCFS. She has applied to become certified to adopt the children if they are freed for adoption. She stated that N.C. is a straight-A student and is on a baseball team and that M.G. attends Head Start and will start dance classes. She expressed her belief that the children should have a spiritual upbringing and noted that they attend the local Pentecostal church. Ms. Hodgkins acknowledged that DCFS reported | ^allegations that N.C. was aggressive toward M.G., but stated that she has not observed aggressive behavior between the children, although sometimes they have “little spats.” She also stated that, during M.G.’s first extended visit, she and N.C. were excited to see M.G. and that the children were “overjoyed” to see each other. She noted that M.G. hugged N.C. and told him that she had missed him. When M.G. returned a few days later for an extended visit, she was excited to be back. She further noted that, during both visits, M.G. did not cry or beg to go back to the Fordhams’ home. She stated that she believes the children need counseling, but expressed that they appear well-adjusted in her home and that it would be devastating for them to be separated again.
On May 26, 2015, the trial court filed written reasons for judgment. It provided a detailed procedural and factual history and summary of the trial testimony. After reviewing all the testimony and the La. C.C. art. 134 factors, it determined that it is in the best interest of M.G. that DCFS be relieved of custody and that guardianship be given to the Fordhams, with visitation to be given to Ms. Hodgkins. It noted that it was impressed with the Fordhams, that M.G. is attached to them and that moving her would be detrimental. It also noted that it was impressed with Ms. Hodgkins; however, although she is a relative, she had very little contact with M.G. *769 prior to her removal from the Fordhams’ home. It stated its belief that DCFS attempted to “demonize” the Fordhams and that, despite expert testimony and reports that counseling was needed to remove M.G. from the Fordhams’ home, it removed her and did not provide her with counseling. It | ^acknowledged testimony that M.G. was doing well in Ms. Hodgkin’s home, but gave more weight to the testimony of Dr. Thigpen and Ms. Thompson as to the long-term effect on M.G. It determined that the Judgment of Disposition should be modified, as circumstances justify, to grant guardianship of M.G. to the Fordhams with visitation with Ms. Hodgkins (and N.C.).[8] It stated that DCFS was responsible' for removing M.G. from Ms. Hodgkins’s home and returning her to the Fordhams’ home.
DCFS appeals.[9]

DISCUSSION

In its sole assignment of error, DCFS argues that the trial court committed manifest error in granting guardianship of M.G. to nonrelated foster parents, i.e., the Fordhams. It contends that relatives have a constitutional right to family integrity and to making decisions about how to rear minor relatives and that this fundamental right should be regarded as a presumption in favor of extended family members.[10] It argues that the trial court ignored the importance and presence of the sibling bond between M.G. and N.C. and erred in separating the two young siblings. It also 118argues that the trial court ignored the extended family relationship and erred in not maintaining custody of both children with DCFS. Citing La. Ch. C. art. 702(C), it argues that the trial court erred in prematurely granting guardianship of M.G. to the nonrelative foster parents (the Ford-hams). It contends that the granting of guardianship was not the most permanent or appropriate plan for M.G., noting that parental rights have not been terminated in this case. It further argues that the Fordhams should not be allowed to intervene in order to further their interest in custody of M.G. and notes that foster parents have limited rights.
< Counsel for M.G. argues that the trial court did not commit-manifest error .'in granting guardianship of M.G. to the Ford-hams and, therefore, that its ruling should be affirmed. Counsel notes that since M.G. entered foster care, attorneys and DCFS employees have changed, but the foster parents and the trial court have remained constant. Counsel points out the continuous determination of the trial court to ensure the best interest of M.G. at every point in the proceeding and of the Fordhams to promote the safety and well-being of M.G. Counsel contends that the trial court acted within its statutory authority to modify a disposition and fash *770 ioned it in a way to .protect and ensure, the best interest of M.G. Counsel further states that the trial court-determined that custody with a relative was not in M.G.’s best interest and. that: it was. in her best interest to be removed from state custody and for guardianship to-be granted to the foster parents. Counsel contends that,- although DCFS argues that M.G.’s parents and extended family have a liberty interest in preserving- the family bond, M.G. has her hflOwn liberty interest in - preserving her family-like bonds with her foster family. Counsel for-M.G. supports the findings of the trial court and' notes that M.G. thrives in her placement with the Ford-hams. * ■
The Fordh'ams argue that the trial court’s decision that it is in M.G.’s best interest to remain with them should be affirmed. They contend that, an analysis of the La. C.C. art., 1-34 best-interest-of-the-child factors favors custody with therm They argue that the trial court did recognize the importance of the sibling bond and the extended family relationships and provided for the preservation of. those relationships by granting-Ms. Hodgkins visitation. They further contend that the grant of guardianship was appropriate- and that it was a preferable option to adoption by Ms. Hodgkins because of M.G.’s -attachment to them.
An appellate court’s review of a juvenile court’s permanent placement determination is governed by the manifest error standard. State ex rel. C.M. v. Willis, 41,908 (La.App.2d Cir.12/27/06), 946 So.2d 316, writ denied, 07-0190 (La.2/16/07), 949 So.2d 413. In a manifest error review, it is important that the appellate court not substitute its own opinion when it is the - juvenile court that is in the unique position to see and hear the witnesses as they testify.' State ex rel. L.M., 46,078 (La.App.2d Cir.1/26/11), 57 So.3d 518. Where there is conflicting testimony, reasonable evaluations. of credibility and reasonable inferences of fact should not be disturbed upon review, even when the appellate court may feel that its own evaluations and inferences are as reasonable as those of the juvenile court. Id. If the juvenile -court’s findings are reasonable in light of the record (^reviewed in its entirety, the appellate court may not reverse, even though convinced that, had it been sitting as the trier of fact, it would have weighed the evidence differently. Id.
Title VI of the Louisiana Children’s Code, i.e., La. Ch. C. arts. 601 to 725.3, sets forth the statutes regarding children in need of care. La. Ch. C. art. 601 states that “[t]he health, safety, and best interest of the child shall be the paramount concern in all proceedings under this Title.”
A child in need of care proceeding shall be commenced by petition filed by the district attorney. La. Ch. C. art. 631(A). DCFS, when authorized by the court, may file a petition if there are reasonable grounds to believe that the child is a child in need of care. Id. A hearing shall be held in which the state has the- burden to prove the allegations of the petition by a preponderance of evidence. La. Ch. C. arts. 664 and 665.
Within 30 days of a child-in-need-of-care adjudication, a disposition hearing shall be conducted. La. Ch. C. art. 678. La. Ch. C. art. 681(A) provides:
In a case in which a child has been adjudicated to be in need of care, the child’s health,and safety shall be the paramount concern, and the court may do any of the following:
(1) Place the child in the custody of a parent or such other suitable person on such terms and conditions as deemed in the best interest of the child including but not limited to the issuance of a protective order pursuant to Article 618.
(2) Place the child in the custody of a private or public institution or agency.
*771 (3) Commit a child found to have a mental illness to a public or private institution for persons -with mental illness.
(4), Grant guardianship of the child to a nonparent.
(5) Make such other disposition or combination of the above dispositions as the court deems to be in the best interest of the child.
| 21 The trial court shall impose the least restrictive disposition of the. alternatives that the court finds is consistent with the circumstances of the case, the health and safety of the child and the best interest of society. La. Ch. C. art. 683(A). The trial court shall place the child in the custody of a relative unless the court has made a specific finding that such placement is not in the best interest of the child. La. Ch. C. art. 683(B). A judgment of disposition shall remain in force only until a-child reaches his or her 18th birthday,- or it may expire earlier by its own terms, if it is modified, or if it is vacated;- La. Ch. C. art. 686. The trial- court may modify a judgment of disposition on its own motion or on the motion of the district-attorney, the department, the child or .his/her parents. La. Ch. C. art. 714, A judgment of disposition may be modified if the court finds that the conditions and circumstances justify the ■ modification. La. Ch. C. art. 716.
The trial court shall conduct a permanency hearing within nine months after the disposition hearing -if the child was removed prior to disposition. La. Ch. C. art. 702(B).. The purpose of. this hearing is to determine the permanent plan for the child. La. Ch. C. art. 603(21). La. Ch. C. art. 702(C)[11] states:
The court shall determine the permanent plan for the child that is most appropriate and in the best interest of the child in accordance with the following priorities of placement:
(1) Return the child to the legal custody of the parents within a specified time period consistent with the child’s age and need for a safe and permanent home. In .order for reunification to remain as. the permanent plan for the child, the parent must be complying with the case plan and making significant ^measurable progress toward achieving its goals and correcting the conditions' requiring the child to be in care.
(2) Adoption.
(3) Placement with a legal guardian.
(4) Placement in the legal custody of a relative who. is willing and able to offer a safe, wholesome, and stable home for the child.
(5) Placement in the least restrictive,' most family-like alternative permanent living arrangement. The department shall document in the child’s case plan and its report to the court the compelling reason for recommending this plan over the preceding higher priority alternatives.-
The trial court shall consider a child’s need for continuing contact with any relative by blood, adoption or affinity with whom the child has an established and significant relationship as one of several factors in determining the permanent plan that is most appropriate and in the best interest of the child. La. Ch. C. art. 702(D). The trial court shall determine whether the department has made reasonable efforts to reunify the parent and child or to finalize the child’s placement in an alternative safe and permanent home while considering that the child’s health and safety will be the, paramount concern in the court’s determination of the permanent plan. La. Ch. C. art. 702(E).
*772 After a child has been adjudicated to be in need of care, a motion for guardianship may be filed by the department, parent, counsel for the child or person named as a successor guardian, or the department may submit a case plan along with the case review report to the court and all counsel of record recommending guardianship. La. Ch. C. art. 720(A). The purpose of guardianship is to provide a permanent placement for children when neither reunification with a parent nor adoption has been found to be in their best interest; to encourage stability and permanence in the lives of children who l^have been adjudicated to be in need of care and have been removed from the custody of their parent; and to increase the opportunities for the prompt permanent placement of children, especially with relatives, without ongoing supervision by the department. La. Ch. C. art. 718.
In the case sub judice, the trial court emphatically found that M.G. should be removed from the custody of DCFS and it granted guardianship to the Fordhams and visitation to Ms. Hodgkins. In arriving at this determination, the trial court provided detailed reasons for judgment in which it noted the procedural history of the case; stated the applicable law, i.e., La. Ch. C. arts. 716, 683 and 681; summarized the tidal testimony of each witness; and analyzed the specific facts of this case. The trial court carefully considered M.G.’s attachment and bond to the Fordhams and her relationship with her half-brother, N.C. It acknowledged that M.G. was doing well while living with Ms. Hodgkins, but ultimately gave more weight to the expert testimony of Dr. Thigpen and Ms. Thompson regarding the negative long-term effects on M.G. if removed from the Fordhams’ home.
Although DCFS argues that extended family members’ constitutional rights to family integrity were violated by the trial court’s judgment, the argument is not supported by the facts of this ease. The trial court carefully analyzed and specifically addressed M.G.’s relationships with her biological family members. In recognition of the sibling relationship between M.G. and N.C., the trial court provided for the maintenance of this relationship (^through visitation by M.G. with Ms. Hodgkins and N.C. two weekends a month and two weeks in the summer.
This court acknowledges that the standard of review in this case is manifest error and that it may not reverse the findings of the trial court, even if it would have weighed the evidence differently if it had been sitting as the trier of fact. . Although a review of the record suggests that placement of both M.G. and N.C. with their great-aunt, Ms. Hodgkins, would be a reasonable outcome in this case, this court does not find that the trial court was manifestly erroneous in modifying the disposition to grant guardianship of M.G. to the Fordhams. This court recognizes the trial court’s unique position to see and hear witnesses, which provides additional information for its analysis and finding of fact that is not available to a court of appeal when reviewing the record. Although this court may have weighed the evidence differently, the trial court’s findings are reasonable in light of the record. Further, this court notes the young age of M.G. and emphasizes her counsel’s observation that, since M.G. entered foster care, attorneys and DCFS employees have changed, but the Fordhams and the trial court have remained constant.
Accordingly, this assignment of error lacks merit.

CONCLUSION

For the foregoing reasons, we affirm the judgment of the trial court awarding *773 guardianship of M.G. to Scott and Christy Fordham. Costs of appeal are assessed to the State of Louisiana, Department of Children & Family Services, in the amount of $3,148.
AFFIRMED.

. This matter was still pending when the trial court filed reasons for judgment in the case now on appeal. DCFS moved for the termination of parental rights of Krystal Corbin, Brandon • Griffis, Mark Huey, Carlos Hernandez and '‘John Doe.” Krystal Corbin is the mother of N.C. and M.G. M.G, was born during Ms. Corbin’s marriage to Brandon Griffis. Carlos Hernandez and Mark Huey are both alleged to be the father of N.C.
DCFS previously requested that Brandon Griffis be ordered to submit to DNA testing to determine whether he is the biological father of M.G. as ho father is listed on her birth certificate and he was married to her mother at the time of her birth. .
DCFS noted that it made a diligent effort to locate any unknown fathers of the minor children and named "John Doe” as the unknown, unnamed father(s) of the children.

. -The trial court accepted Ms. Thompson as an expert as a licensed professional counsel- or.

. During her testimony, Mrs. Fordham explained that M.G. is biracial.

. The trial court accepted Dr. Thigpen as an expert in the field of family psychology.

. The trial court accepted Dr. O'Boyle as an expert in child abuse pediatrics.

. Dr. O'Boyle' mentioned that she' had previ- . ously met with M.G. on at least three occasions to sedate her for various medical tests and procedures. She explained that, when she met with M.G. at DCFS’s request, she did not recognize M.G. as the same child she had previously met.

. In Watermeier v. Watermeier, 462 So.2d 1272 (La.App. 5th Cir.1985), writ denied, 464 So.2d 301 (La.1985), the Louisiana Fifth Circuit Court of Appeal discussed the testimony of children in custody cases. The court determined that the interview must be conducted in chambers outside of the presence of the child’s parents, but in the presence of their attorneys, with a record being made by the court reporter. The court also found that the attorneys may only ask questions regarding the child's competency.

.Specifically, the court granted visitation with Ms. Hodgkins on the first and third weekends of every month from 6:00 p.m. on Friday to 6:00 p.m. on Sunday. During the summer months, the trial court determined that visitation will be one full week in June, beginning the third Sunday at 4:00 p.m. and ending the next Sunday at 4:00 p.m,, and one full week in July, beginning the third Sunday at 4:00 p.m. and ending the next Sunday at 4:00 p.m.
On June 18, 2015, the trial court filed a clarification of written reasons for judgment to designate where the parties were to meet for exchange of the child and whether summer visits include weekend visitation.

. The Fordhams also filed an appeal in this case, but they later filed a motion to dismiss their appeal and reserved their right to continue as appellees.

. In making this argument, DCFS cited Troxel v. Granville, 530 U.S. 57, 120 S.Ct. 2054, 147 L.Ed.2d 49 (2000), and Santosky v. Kramer, 455 U.S. 745, 102 S.Ct. 1388, 71 L.Ed.2d 599 (1982).

. La Ch. C. art. 702(C)(5) was amended in 2015 to add a part (b), which states: ."The permanent plan provided for in this Paragraph may be considered only if the child is sixteen years of age or older.”