Judgment rendered January 12, 2022.
Application for rehearing may be filed
within the delay allowed by Art. 2166,
La. C.C.P.

No. 54,304-JAC

COURT OF APPEAL
SECOND CIRCUIT
STATE OF LOUISIANA

* * * * *

STATE OF LOUISIANA
IN THE INTEREST OF
K.W., M.A., E.G., Z.W., C.W., Kh.W.

* * * * *

Appealed from the
Fourth Judicial District Court for the
Parish of Ouachita, Louisiana
Trial Court No. 22,717

Honorable Sharon I. Marchman, Judge

* * * * *

| | |
|---|---|
| CINC APPELLATE PROJECT<br>By: Annette Roach | Counsel for Appellant,<br>C.W., Mother |
| LAYNE M. ADAMS | |
| JOHNNY L. SANDERS, II | Counsel for Appellee,<br>State of Louisiana |
| THE LOWERY LAW FIRM<br>By: Scotty Lowery | Counsel for Appellees,<br>M.A., E.G., Z.W., C.W.,<br>Kh.W., Minor Children |
| LEGAL SERVICES OF NORTH<br>LOUISIANA<br>By: Angela Smith | Counsel for Appellee,<br>K.W., Minor Child |
| COURTNEY W. FRANKLIN | Counsel for Appellee,<br>State of Louisiana, DCFS |

ADAM ROSS                          Counsel for Appellees,
                                   R.A., G.G., S.W., M.T.,
                                   Fathers

* * * * *

Before PITMAN, STONE, and ROBINSON, JJ.

**ROBINSON, J.**

In this juvenile court proceeding, the mother, Ch.W., suspensively appeals a judgment granting guardianship of four of the six minor children that were subjects of the case plan, E.G., Z.W., C.W., and Kh.W., to the children's maternal aunt and uncle, so that the mother could continue to work her case plan with a goal toward reunification with the subject children. We AFFIRM the trial court's judgment, but REMAND to set specific supervised visitation pursuant to La. Ch. C. art. 723(B).

## FACTS AND PROCEDURAL HISTORY

Ch.W. has eight minor children: N.A. (dob: 8/4/2003); J.A. (dob: 10/26/2004); K.W. (dob: 10/26/2007); M.A. (dob: 5/17/2010); E.G. (dob: 2/25/2013); Z.W. (dob: 7/3/2014); C.W. (dob: 6/15/2015); and Kh.W. (dob: 11/6/2016).[1] R.A. is the father of N.A., J.A., K.W.[2], and M.A., G.G. is the father of E.G., S.W is the father of Z.W., and M.T. is the father of C.W. and Kh.W. None of the fathers appear to be in opposition to or in support of either the State or Appellant. Six of the eight children were subjects of the case plan, but this appeal is limited to only four of the six since a judgment of guardianship has not yet been rendered as to the other two children.

On February 27, 2020, the Department of Children and Family Services ("DCFS") received a report alleging neglect/lack of supervision. Z.W. had been coming to school complaining of a stomach ache, ultimately telling a school worker that one of her brothers, K.W., had touched her inappropriately in her private area. The school did not notify Ch.W. of the

---

[1] There were discrepancies throughout the records for several of the children's birth dates. The birth dates stated herein are those confirmed by the respective child's vaccination record.

[2] There was some discrepancy is the surname of K.W. and whether it was the same as the child's father.

incident, but, instead, directly contacted DCFS, and a case was opened on allegations that the 6 youngest of Ch.W.'s 8 minor children lacked supervision. School staff stated that this incident was not the first reported by Z.W. regarding K.W.'s inappropriate conduct. There had also been an incident reported by the school in 2019 involving K.W.'s reported misconduct toward M.A.

Following the February 2020 incident, Z.W. was interviewed by DCFS, in which she disclosed particulars of K.W.'s sexual misconduct, but expressed that it was a family secret and was afraid of being punished if she talked about it. The other siblings were interviewed, but did not disclose any sexual misconduct. Some of the children stated that they would be punished if they talked about what happened at home. Ch.W. was interviewed and denied any knowledge that K.W. touched Z.W. She did disclose that N.A. was abused by G.G., Ch.W.'s ex-boyfriend and father of E.G, and that J.A. had touched C.W. and Z.W. in the past, which she claimed to have previously reported to law enforcement. She also revealed that J.A. had been touching K.W., which she had found out the previous year.

Ch.W. and her family also have a history with DCFS. In June 2010, Ch.W.'s newborn, M.A., was born exposed to marijuana. In August 2011, K.W. was the victim of physical abuse determined to be inflicted by his maternal grandmother. In May 2013, there was sexual misconduct of N.A. by Ch.W.'s then-boyfriend, G.G. In November 2013, there was a domestic violence incident between Ch.W. and G.G. in the presence of several of the minor children. In November 2015, Ch.W. abused J.A. when she whipped him with a stick. In January 2016, the maternal grandmother threatened

harm to J.A. In December 2016, Ch.W. caused bruises on her daughter, N.A., when she whipped her with a board.

Ch.W. initially wavered in her cooperation with DCFS. She and her children participated in interviews. She took Z.W. to the hospital on February 28, 2020, for an examination, though it was ultimately not conducted because Z.W. would not disclose abuse. She made arrangements for K.W. to live with a family friend and he left the home on or about March 1, 2020. However, in interviews with an agent on March 2 and 3, 2020, Ch.W. declined services and counseling and denied the allegations, claiming there was no evidence and that the investigation was detrimental to her family. Then, on March 4, Ch.W. agreed to place certain safety measures at the home such as cameras and chimes, separating sleeping arrangements, and partaking in Family Services and counseling. Nevertheless, on March 11, 2020, Ch.W. denied access to her home when a DCFS agent visited unannounced, claiming that she was on her way to an appointment to get a prom dress for her oldest daughter. Ch.W. claims she attempted to meet with a DCFS agent the following day to agree to the family services, but with a request for some scheduling accommodations.

In response to Ch.W.'s initial refusal of family services, DCFS requested custody based on: Ch.W. appearing to have diminished caretaker protective capacities, putting her needs before her children's, the family history of sexual abuse, failing to implement the safety measures discussed with DCFS, and refusing family services and counseling. The State was granted an instanter order on March 12, 2020, and after a hearing on March 30, 2020, the court authorized the removal from Ch.W. of the six children:

3

K.W., M.A., E.G., Z.W., C.W., and Kh.W. The two oldest children, N.A. and J.A., remained in the home.

A petition to declare a child in need of care was filed on April 22, 2020, for the six removed children and an answer was filed May 14, 2020. A hearing was conducted on June 15, 2020, wherein the court found the six children to be in need of care and ordered them to remain in the custody of DCFS. The four youngest girls – E.W., Z.W., C.W., and Kh.W. – were placed together with a maternal aunt and uncle. M.A. was initially placed in a certified foster home, then moved to the home of a close family friend in May 2020, then to a certified foster home in March 2021. K.W. was initially placed in a group home, but later placed with his paternal grandparents in April 2020. The case plan established for Ch.W. was finalized on April 9, 2020, and approved June 18, 2020, and was composed of the following requirements: monthly visits with a case worker, parenting classes, maintaining suitable housing and employment, submitting to substance abuse and mental health assessments, submitting to random drug screens, and attending counseling and visits with the children.

DCFS referred Ch.W. for a mental health assessment, substance abuse assessment, and parenting classes. She participated in both individual and family counseling with N.A. and J.A. She was living in a home that was structurally adequate. She was employed and provided proof of income until her employment was terminated in May 2020. However, she declined a drug screen in August 2020, admitting marijuana use.

Following the June hearing, Ch.W. informed DCFS during their visit that she planned to move to Texas. In August 2020, she moved to Grand Prairie, TX, with N.A. and J.A. to live with a family member. She quickly

4

found employment, then moved with the two children into another residence. At the 90-day review in September 2020, DCFS informed all parties of Ch.W.'s relocation to Texas. She was still working her case plan in Louisiana and regularly visiting her other children in Louisiana. DCFS located service providers and Ch.W. continued substance abuse and parenting classes. She continued counseling, with the exception of a period of approximately one month due to her inability to qualify for Texas Medicaid from earnings being too high.

DCFS requested a home study of the Texas home in October 2020 through Interstate Compact on the Placement of Children ("ICPC"), which was conducted on December 23, 2020. The ICPC study failed and placement of the children with Ch.W. was denied due to the following reasons noted in the Texas Department of Family and Protective Services memorandum dated January 4, 2021:

1. Lack of smoke detectors,
2. Lack of out-of-state background checks from Ch.W.'s previous residences,
3. Prior validated cases of physical abuse by Ch.W.,
4. Prior threats of a physical punishment of the children if they spoke out about the sexual abuse and concerns with whether Ch.W. can be protective or whether she would encourage the children to keep abuse a secret,
5. Prior sexual abuse by J.A., who was still living in the home at the time of the study,
6. Prior sexual abuse of N.A. by Ch.W.'s then-boyfriend (father of E.G.),
7. Ch.W.'s recent marijuana use,
8. Ch.W.'s past childhood trauma that had not been addressed in therapy,
9. Past domestic abuse of Ch.W.,
10. Financial instability and the fact that Ch.W. would need financial and community assistance to support the children, and
11. Ch.W.'s past criminal history beginning in her juvenile years.

Following failure of the home study, Ch.W. admitted K.W.'s sexual abuse of Z.W. and M.A. She informed DCFS of her intended bedroom arrangements upon return of the children. She would share with C.W. and Kh.W.; N.A., E.G., and Z.W. would share; and J.A., K.W., and M.A. would share. DCFS expressed concern that two perpetrators would be sharing with an abused, M.A.

A permanency hearing was scheduled for March 11, 2021, wherein DCFS initially requested that the goal of the case plan be changed from reunification to guardianship. However, the parties ultimately agreed to maintain the reunification goal and continue the case for three months to allow the mother to complete her case plan. All other parties had intended that there be a six-month extension, but Ch.W. requested that it be shortened to only three months. Counsel for the children was agreeable to leaving the goal at reunification with a review in three months, but sought a pattern of negative drug screens by that time, and opposed allowing any of the four girls – E.G., Z.W., C.W., and Kh.W. – to live with the offending children, K.W. and J.A.

Ch.W. continued her individual and family counseling and parenting classes. She had negative drug screens in January 2021 and June 2021.

During the March hearing, the children's attorney and DCFS recommended J.A.'s removal from the home. After making several other attempts for someone to take J.A., in May 2021, Ch.W. placed J.A., who was 16 years old at the time, in a home in Tallulah, Louisiana, owned by a cousin who was living in Ruston while attending Louisiana Tech. She paid six months of rent and provided J.A. with a vehicle, though he did not yet have a driver's license. She did not discuss the plan with DCFS prior to

6

making it, but was not offered any alternate solutions. Shortly after moving into the home, there was an incident where J.A. accidently shot and killed his older half-sister while cleaning a gun found in the home.

A second ICPC home study was requested in early June 2021 for placement back into the home of the four girls only, after Ch.W. indicated that she had installed smoke detectors, accepted that the children had been sexually abused, acknowledged that the perpetrators could not be in the same home as the victims/potential victims, advised that J.A. was no longer in the home, agreed to only the four girls and M.A. (non-offending male) returning home, and arranged for the girls to sleep in one room and M.A. in a separate room.

The rescheduled permanency hearing took place July 8, 2021. DCFS testified that J.A. had been removed from the home; Ch.W. had continuously been in counseling; she had completed substance abuse treatment on December 14, 2020, and her drug screens had been negative since then; she completed parenting classes on November 23, 2020; and she visited the children regularly. Verification of Ch.W.'s income had been provided. DCFS had also conducted a virtual home visit and stated that Ch.W.'s home was adequate, but it had not yet been approved through the Texas ICPC study, which was requested in June 2021, but not yet conducted.

After hearing the evidence, the trial court found that the goal of guardianship was appropriate for all six children and granted immediate guardianship for the four youngest children: E.G., Z.W., C.W., and Kh.W. Ch.W. appealed the judgment of guardianship on July 19, 2021.

## DISCUSSION

The purpose of guardianship is to provide a permanent placement for children when neither reunification with a parent nor adoption has been found to be in their best interest; to encourage stability and permanence in the lives of children who have been adjudicated to be in need of care and have been removed from the custody of their parent; and to increase the opportunities for the prompt permanent placement of children, especially with relatives, without ongoing supervision by the department. La. Ch. C. art. 718(A). It is intended to ensure that the fundamental needs of children are met and the constitutional rights of all parties are recognized and enforced. La. Ch. C. art. 718(B).

La. Ch. C. art. 702 requires a court to determine a permanent plan for a child that is the most appropriate and in the best interest of the child in accordance with certain priorities of placement, guardianship being below reunification and adoption, respectively, with the health and safety of the child being the paramount concern in its determination of the permanent plan.

A mover for guardianship shall have the burden of proving all of the following by clear and convincing evidence:

(1) The child has been adjudicated to be in need of care.
(2) Neither adoption nor reunification with a parent is in the best interest of the child.
(3) The child has resided for at least six months with the proposed guardian, unless the court waives the residence requirement for good cause.
(4) The proposed guardian is able to provide a safe, stable, and wholesome home for the child for the duration of minority.
La. Ch. C. art. 722(A).

Ch.W. essentially argues that the trial court was manifestly erroneous in finding that the guardianship was the most appropriate disposition and in

8

the best interest of E.G., Z.W., C.W., and Kh.W.  She further argues that the State failed to prove by clear and convincing evidence that Ch.W. had not made significant progress toward achieving the goals of her case plan and correcting the conditions that led to the children being placed in the custody of DCFS, and that the trial court was manifestly erroneous in finding that DCFS made reasonable efforts to reunify the four children with their mother. She maintains that the judgment of guardianship should be reversed and the case plan goal amended back to reunification and sufficient time given for either completion of the home study for the Texas home or for reestablishment of a home in Louisiana, with assistance offered by DCFS, and for continued counseling to properly address issues identified in the prior home study.

"Although the first priority in permanently placing a child is the return of the child to the legal custody of the parents within a specified time, for reunification to remain the permanent plan for the child, the parent must comply with the case plan and make significant measurable progress toward achieving its goals and correcting the conditions which necessitated the child to be in care." *State ex rel. J.B. v. J.B., Jr.*, 35,846 (La. App. 2 Cir. 2/27/02), 811 So. 2d 179, 187 citing La. Ch. C. art. 702(C)(1).  "Mere cooperation by a parent is not the sole focus of the evaluation of a permanency plan. Rather, the courts must assess whether the parent has exhibited significant improvement in the particulars that caused the State to remove the children from the parent's care and custody." *State in the Interest of E.M.*, 51,511 (La. App. 2 Cir. 6/2/17), 224 So. 3d 1122, citing *State in the Interest of P.B.*, 49,668 (La. App. 2 Cir. 12/7/14), 154 So. 3d 806.

The trial court found that the State met its burden of proof set forth in La. Ch. C. art. 702 to show that neither reunification nor adoption was in the best interest of the children. It found that Ch.W. had not substantially completed her case plan to justify allowing additional time, especially since there had already been a 90-day extension granted. It reasoned that the children could not be placed with the mother due to the failed ICPC home study and it was unlikely that the second home study would pass since several grounds for the previous failed home study still existed.

The court granted guardianship as the most appropriate and least restrictive option, noting that guardianship was entered instead of adoption because of the bond between Ch.W. and each of her children. It also noted that guardianship is less restrictive than adoption as a permanent placement since there is the possibility of modification or termination by the juvenile court under La. Ch. C. art. 724.

To reverse a trial court's permanency plan determination, an appellate court must find from the record that the trial court's finding is clearly wrong or manifestly erroneous. *State in Interest of D.E.*, 52,305 (La. App. 2 Cir. 8/15/18), 253 So. 3d. 877, *citing State in Interest of N.B.*, 51,374 (La. App. 2 Cir. 2/15/17), 215 So. 3d 398 and *State in Interest of C.S.*, 49,955 (La. App. 2 Cir. 3/18/15), 163 So. 3d 193. In a manifest error review, it is important that the appellate court not substitute its own opinion when it is the juvenile court that is in the unique position to see and hear the witnesses as they testify. *State in Interest of D.E.*, *supra*, *citing State in Interest of P.F.*, 50,931 (La. App. 2 Cir. 6/22/16), 197 So. 3d 745; *State in Interest of N.C.*, 50,446 (La. App. 2 Cir. 11/18/15), 184 So. 3d 760. If the juvenile court's findings are reasonable in light of the record reviewed in its entirety, the

10

appellate court may not reverse, even though convinced that, had it been sitting as the trier of fact, it would have weighed the evidence differently. *State in Interest of D.E.*, *supra*, *citing State in Interest of N.C*, *supra.*

It is apparent from the record that the trial court thoroughly considered all evidence presented throughout the course of this matter when determining that guardianship was in the best interest of the children. While Ch.W. did make progress with her case plan, the court ultimately found that certain issues cited in the Texas ICPC home study still existed that were significant enough to justify its conclusion that a guardianship was in the best interest of the children.

In addition to the issues with the home study that were unlikely to be resolved in a follow-up study, there were other issues in support of the trial court's decision. It was as recent as May 2021 that Ch.W. removed J.A. from the home, one of the perpetrators of sexual abuse. From her own admission, it was her understanding that all of her children were to return home, including the perpetrators. It was only upon the urging of DCFS after the March 2021 hearing that she acknowledged that the perpetrators and the abused could not live together. This lack of understanding of the severity of the situation and inaction for over one year of working the case plan is evidence that Ch.W. had not exhibited significant improvement in the particulars that necessitated the children to be in care, that is, the lack of supervision and ability to protect the children from further abuse. In addition, the fact that at the same time, Ch.W. found it appropriate to allow her 16-year-old to live alone, hours away from her, and giving him a vehicle when he did not have a driver's license, further supports this conclusion.

11

Given the review of this record in its entirety, this court does not find that the trial court committed manifest error in its determination to order guardianship of E.G., Z.W., C.W., and Kh.W.

However, this court finds that the trial court erred by not addressing specific guidelines as to Ch.W.'s visitation of E.G., Z.W., C.W., and Kh.W. in the judgment of guardianship, which merely states, "Any visits between the parents and minor children shall be supervised by the Guardian." La. Ch. C. art. 723(B) requires that the guardianship judgment address the frequency and nature of visitation or contact between the children and their parents as necessary to ensure the health, safety, and best interest of the children. It is error for the trial court to leave specific terms of visitation to the guardians' discretion. *State in Interest of D.E.*, *supra*. Therefore, we remand this matter to the trial court to set specific supervised visitation periods and conditions for Ch.W. and each of the children's fathers with their respective children, while considering travel distance between each parent's and guardians' homes.

## CONCLUSION

For the foregoing reasons, this court AFFIRMS the trial court's judgment of guardianship of E.G., Z.W., C.W., and Kh.W., but the matter is REMANDED to the trial court to set specific supervised visitation.

**AFFIRMED AND REMANDED.**

12