WILLIAMS, C.J.
*127 S.A., the father of A.A., A.A., and A.W., appeals a judgment of the trial court awarding custody of the minor children to the mother, D.W. For the reasons that follow, we affirm in part, reverse in part and remand with instructions.
FACTS
S.A. ("the father") and D.W. ("the mother") are the biological parents of three minor daughters, A.A. (born November 17, 2001), A.A. (born November 21, 2002), and A.W. (born July 18, 2007).[1] The children had been in the custody of the father for approximately seven years due, in part, to the mother's history of substance abuse.
On October 20, 2016, the Department of Children and Family Services ("DCFS") received a report from a high school counselor in Monroe, Louisiana, alleging that the victim, who was 14 years old, had reported the following to two school counselors: she was having thoughts of suicide; she was "fed up" with her father's abusive tendencies; her father had "beaten" her that morning; and her father had been "whipping" her with two belts at a time since she was in the sixth grade. The victim showed the counselors multiple "red welts" on her legs and thighs. The DCFS report also stated that the victim reported that she planned to commit suicide by hanging herself with a "belt or rope."
During its investigation of the allegation of abuse, DCFS interviewed several individuals, including the victim, A.A., A.W., the father, the mother, and school personnel. The victim stated as follows: the father learned about comments she had published on her social media account; he confronted her and demanded that she log into her account so that he could delete the account; she refused to do so; the father instructed her to "hold her hands out so that he could whip her"; when she refused to follow his instructions, the father began to strike her with two belts at the same time; the father customarily struck her and her sisters on their hands, arms or buttocks "because he does not want to leave marks for their schools to see";[2] the father would tell her and her sisters that calling DCFS would be futile because "they didn't do anything to him on the two occasions they came out" in the past; and the abuse from the father caused her to consider committing suicide.[3]
During his interview with the DCFS investigator, the father admitted that he "disciplined" the victim because she disobeyed him. He stated that he attempted to strike the victim on her hands but he was unable to do so because she was "fighting him off." The father also stated that the victim wanted him to leave bruises on her body "so she could report it."
A.A. and A.W. corroborated the victim's account of the events of that morning. They also reported that they had been *128 subjected to "whippings" by the father and that they were afraid of him, and stated that they did not like living with their father because he was "abusive." According to A.A., the father would often state, "I don't care if I abuse you." A.W. stated that she felt "like she is in prison at her father's house."[4]
DCFS received an instanter order, dated October 20, 2016, removing the children from the custody of the father and placing them in the custody of DCFS; the reason for the order/removal was "physical abuse." A continued custody hearing was held on October 25, 2016. During that hearing, the state requested that the mother be tested for illegal drugs; the trial court so ordered. The father stipulated to continued custody of the children with DCFS with "liberal visitation" with A.A. and A.W.[5] At the conclusion of the hearing, the court found "reasonable grounds to believe the children are in need of care, that continuation in the home is contrary to the welfare of the children and that continued custody is necessary for the children's safety and protection."
A review hearing was held on November 18, 2016, during which it was revealed that the mother had tested positive for cocaine. Subsequently, on November 30, 2016, the state filed a petition to adjudicate the children in need of care. Thereafter, the father and the mother stipulated that the children were in need of care without admitting the allegations set forth in the petition. The court's disposition order continued custody of the children with DCFS with a goal of reunification with a parent. By this time, A.A. and A.W. had been placed in the home of a maternal relative; the victim had been placed in a group home.
Throughout these proceedings, the father and the mother were provided with individual case plans. The father's case plan required him to, inter alia : maintain adequate shelter, food and utilities; attend visitations with the two younger daughters; complete a DCFS-approved anger management class; demonstrate what he learned in the parenting and anger management classes during supervised visits with the children; complete individual therapy sessions and family counseling with his children and follow the recommendations of the provider; complete a batterer's intervention program and follow the recommendations of the provider; pay $75 per child in monthly parental contributions to support the children while in DCFS custody; and make himself available for monthly DCFS home visits.
The mother's case plan required her to, inter alia : maintain adequate shelter, food and utilities; attend visitations with the children;[6] continue to pay court-ordered child support; submit to a DCFS-approved substance abuse assessment and follow the recommendations of the provider; submit to random screenings for illegal drugs; develop a "relapse plan" for the children in the event of relapse; enroll in a 12-step program and aftercare program; and make *129 herself available for monthly DCFS home visits.[7]
A review hearing was held on October 10, 2017. During that hearing, it was revealed that the father was no longer represented by the attorney he had retained. The father refused to be screened to ascertain whether or not he qualified for legal representation by the indigent defender board. Throughout the proceedings, the father rejected the trial court's offer to appoint an attorney. The father would often complain that he did not understand the case plan or certain aspects of the proceedings; however, he ignored the trial court's recommendation that he obtain legal counsel. Rather, the father steadfastly opted to represent himself.
Meanwhile, according to DCFS, the mother made significant progress on her case plan: she maintained adequate housing; she attended visits with the children; she earned sufficient income to meet the needs of the children; she was able to demonstrate a willingness to place the needs of the children above her own; she completed a substance abuse program, participated in a 12-step program and maintained her sobriety.[8]
The father completed anger management and parenting classes. However, he did not demonstrate that he had the ability to apply what he learned from the classes because he ceased visiting with the children under DCFS supervision.[9] The father also failed to complete a batterer's intervention program, a more in-depth program aimed at addressing anger and abuse issues. Further, the father stopped attending individual and family therapy sessions.[10]
A review hearing took place on January 9, 2018. At that hearing, DCFS requested to "maintain the goal of reunification with the concurrent goal of adoption[.]" According to DCFS, although the mother had completed most of her case plan, "she still need[ed] to work on some substance abuse issues." At that hearing, the father informed the court that he was unaware that *130 the plan was to reunite the children with the mother because he had been "led to believe that reunification was going to be with [him]." The father also responded to DCFS's assertions that he had not completed his case plan as follows: he attended only one family therapy session because the therapist "only scheduled one" appointment; he could not afford to pay for the batterer's intervention course; he was not aware that his case plan required him to make financial contributions for the support of the children; he did not want counsel appointed because his previous attorney "gave [him] a false sense of hope"; he suspended visits with A.A. "because I didn't want to put too much pressure on her"; he was not comfortable attending visits "in a small room," and he was not allowed to take A.A. and A.W. "out to eat and stuff like that"; and he could not afford to financially contribute to the children's care because he was paying legal fees stemming from the criminal charges and from the child custody matter.
During the hearing, both DCFS and the trial court noted that the mother had completed all aspects of her case plan "except the sobriety." Additionally, during the hearing, it was noted that the mother's Medicaid insurance paid for her therapy sessions, while the father was paying through private insurance and out of pocket. The father reiterated that he was willing to complete his case plan but he was unable to afford the cost of completing the courses. He stated that he would comply with the case plan if DCFS would pay for his courses. The trial court advised the father to "get a lawyer" to assist him in understanding the proper procedures to follow. At the conclusion of the hearing, the state recommended that the goal remain reunification and that the mother's visitation be increased to include some overnight visits with the children. The father was ordered to refrain from visiting the children outside of DCFS supervision.[11] The court also ordered that the goal remain reunification. Further, the court addressed the father as follows:
[I] think you're at a disadvantage by not having [an attorney], especially that may be free to you, but, uh - well-so, Mr. [A.] it's going to be - I'm going to give - we'll have a new date of February 23, 2018. We'll get notice to him of that date, and that'll be the day that you can call your witnesses and bring your testimony forward to prove your aspects of the case plan. The goal right now will be Reunification. We'll maintain the goal of Reunification with [the mother] and have some increased visitation.
Mr. [A.], all of your rights need to go through D.C.F.S. That - that's the only way that it can go. All of your financial contributions need to be documented through D.C.F.S. You don't give them $10 on the side to each of them and say here's $10. You give $30 to D.C.F.S. and let D.C.F.S. distribute the $30 to them.
Everything needs to go through them for your - I mean, there's a reason they were removed, and the State puts a high threshold on what needs to be done to go back. We just can't be in a world where, you know, parents come back and say, Well, let me tell you about all the things that they don't know I've been doing." That - that just, sort of, isn't the way it works[.]
***
*131 Mr. [A.], like I said, bring your witnesses on that day, sir, so we can go forward or - or - I - I'll give you one more chance if you want to rethink that lawyer. Mr. Manning's - Mr. Manning would love nothing better than to jump in right now[.][12 ]
***
The father chose to continue to represent himself.
Another review hearing was held on February 23, 2018. The DCFS foster care supervisor reported that the mother's drug screens had been negative for six months.[13] The foster care supervisor also reported that the agency had begun a trial placement with the children in the mother's home and that the placements regarding A.A. and A.W. were going well. However, the supervisor reported that the victim had "made a false report" to DCFS regarding the mother.[14] The DCFS foster care supervisor also reported that, at that time, the agency was not recommending reuniting the victim with the mother because the victim was struggling with ongoing issues of self-harm.
During the hearing, the children's attorney reported that the children continued to express that they did not want to live with the father; however, they had expressed a desire to maintain visitation with him. The father stated, "I don't have anything against the mother. You know, I want to establish a relationship with my children as well." He also stated that he was not willing to relinquish custody of the children because he did not believe the mother was capable of caring for these three children, in addition to her three younger children, on her own. The father continued to express that supervised visitation with the children at the DCFS office was "uncomfortable."
The trial court addressed the father's statements by explaining that being "uncomfortable" is often a part of the CINC process. The court encouraged the father to "take the best advantage of what you have." The father continued to express his views that DCFS was assisting the mother with her case plan but was not providing him with similar assistance. The trial court encouraged the father to "do everything [DCFS] asks you to do even if it's uncomfortable."
A permanency hearing was held on April 3, 2018, during which DCFS requested to be relieved of custody of the children and recommended that they be placed in the custody of the mother. The foster care supervisor reported that the children had been residing in the mother's home for approximately one month and that they were doing well. The attorney representing *132 the children also reported that the children were doing well and that they had expressed a desire to remain in the custody of the mother.
The father requested full custody of the children. In the alternative, he requested, "if not full, at least half because the mother has six children, and she's not going to be able to provide for all six." He reiterated his objection to the way he believed DCFS handled the case and complained that he was not provided with the services necessary to complete his case plan. The trial court stated:
All right. Well, your - your objections are noted, Mr. [A.]. I think at this point in time I find that it is in the best interest to have the children placed with their mother, and you know, you can work on your relationship that you have with your children. It's that simple.
The father objected to the ruling, stating that DCFS had "violated [his] rights." The trial court encouraged the father to seek legal counsel and informed him that its ruling was "about the best interest of the children." DCFS recommended supervised visitation for the father. The trial court and the attorney representing the children expressed concerns with regard to who would supervise visitation once DCFS was released from the case. The attorney for the children indicated that having the mother responsible for supervising visits was "a recipe for disaster, quite frankly." The mother's attorney requested a recess to confer with his client regarding supervised visits. When matter reconvened, the trial court stated:
We will return [the children] to [the mother]. This Court will, uh - will dispose of the jurisdiction. Of course, if something comes up later on, we would be back in place but the children will perman - permanently be placed back with their mother[.] They're basically yours now, ma'am. You get to decide who they go visit. You get to decide when they visit, where they visit, and all of those kinds of things. I would encourage you to work with the father because he does have the right to see his children and then maintain [a] relationship.
Sir, if you're not pleased with what happens, you can go file a suit down in the Ouachita Parish Court. That will be a civil matter. The D.C.F.S. aspect is done. You know, kind of we're done. This is where the children are going to go. You can bring your own matter in your name that doesn't have D.C.F.S. involved at all where you'll go before another judge and say, "I'm not seeing my kids enough."
Thereafter, the following colloquy occurred:
[THE FATHER]: What's the grounds though? I mean they -
THE COURT: The grounds are that the case plan has been worked, that we've had a trial placement, and that everything's been done on her end, and I've not seen progress on your end.
[THE FATHER]: I haven't been given a fair opportunity. I've stressed that several times.
THE COURT: Yes, sir, you have. You have and I think the last time I told you that you need to bring me your proof today, of you know - that you've been denied these things. Do you have witnesses out there?
[THE FATHER]: I - I wanted another court date because I didn't have time to prepare.
THE COURT: No sir. We were here last in January -
***
[THE FATHER]: It was a few witnesses that I couldn't get in touch with.
*133 THE COURT: January and February, all of March has gone by and we're into April. The - this case has been going on for how long?
***
We're not going to say we haven't had time.
***
The written judgment provides, in pertinent part:
***
The Department's efforts to finalize the children's permanency plan were reasonable because [the mother] has maintained housing and has been able to meet the needs of the other children in her home. [The mother] has completed the substance abuse portion of her case plan. [The mother] has income to meet her children's needs. She has been able to maintain her sobriety and put the needs of her children before her own.
[The father] has made very little progress on his case plan. [The father] has completed the instructional Parenting portion of his case plan and anger management. However, [the father] has not been able to apply what he should have learned from Parenting and Anger Management. [The father] does not want the agency to supervise any visits. [The father] has not requested any visits with his children to-date. He is not addressing the reason the children came into care.
***
Court finds the extent of [the mother's] compliance with the case plan satisfactory , the health and safety of the child[ren] being the paramount concern.
***
Court finds the extent of [the father's] compliance with the case plan unsatisfactory , the health and safety of the child[ren] being the paramount concern.
***
(Emphasis in original).
The father now appeals.[15]
DISCUSSION
The father contends the trial court erred in adjudicating the children in need of care. He argues that he did not stipulate that the children were in need of care, and if his prior attorney did so on his behalf, the stipulation was without his knowledge or consent. The father also argues that the children were not in need of care because DCFS did not prove that he physically abused the victim. Further, the father asserts that the victim has a "history of self-harm and manipulation," and he implies that the marks/bruises seen on the victim on the day of the incident could have been self-inflicted. According to the father, the victim wrote a letter apologizing for her accusations and he has "forgiven her."
The purpose of Title VI of the Children's Code, entitled "Child in Need of Care" and applicable to these proceedings, is "to protect children whose physical or mental health and welfare is substantially at risk of harm by physical abuse, neglect, or exploitation and who may be further threatened by the conduct of others[.]" La. Ch. C. art. 601. Furthermore, "the health, safety, and best interest of the child shall be the paramount concern in all proceedings under [Title VI]." Id.
The law regarding child in need of care *134 ("CINC") proceedings is well settled.[16] La. Ch. C. art. 606 sets forth the grounds on which a child can be adjudicated in need of care, and provides, in pertinent part:
A. Allegations that a child is in need of care must assert one or more of the following grounds:
(1) The child is the victim of abuse perpetrated, aided, or tolerated by the parent or caretaker [and] his welfare is seriously endangered if he is left within the custody or control of that parent or caretaker.
***
La. Ch. C. art. 603(1) provides, in pertinent part:
"Abuse" means any one of the following acts which seriously endangers the physical, mental, or emotional health and safety of the child:
(a) The infliction, attempted infliction, or, as a result of inadequate supervision, the allowance of the infliction or attempted infliction of physical or mental injury upon the child by a parent or any other person.
***
We first note that the father's contention that he did not stipulate that the children were in need of care is belied by the record in this case. A full hearing was conducted on January 10, 2017, during which the parties unequivocally stipulated that the children were in need of care. The colloquy was as follows:
[ASSISTANT DISTRICT ATTORNEY]: [A]t this time, I believe, we're able to stipulate to child in need of care.
[COUNSEL FOR THE MOTHER]: Your Honor, on behalf of the mother, we are willing to stipulate without admitting fault to the allegations.
[COUNSEL FOR THE FATHER]: On behalf of the father, we're willing to stipulate without admitting fault on behalf of the father.
[COUNSEL FOR CHILDREN]: I would not be opposed to that stipulation, Your Honor.
***
(Emphasis added). Additionally, the father, through counsel, signed a written stipulation *135 which stated, "Parent [S.A.] stipulates that child is in need of care without admitting the allegations of the petition."
Nevertheless, the father has indicated that he did not knowingly enter into the stipulation that his children were in need of care and/or he did not understand the nature of the stipulation. Therefore, out of the abundance of caution, we have reviewed the record to ascertain whether the trial court erred in adjudicating the children in need of care.
Adjudication of a child in need of care is warranted when a parent shows a repeated pattern of placing a child at risk. State ex rel. L.M. , 46,078 (La. App. 2 Cir. 1/26/11), 57 So.3d 518 ; State ex rel. AR , 1999-0813 (La. App. 1 Cir. 9/24/99), 754 So.2d 1073. At the adjudication hearing, the state bears the burden of proving by a preponderance of the evidence that the child is a child in need of care. La. Ch. C. art. 665 ; State ex rel. L.B. , 2008-1539 (La. 7/17/08), 986 So.2d 62 ; State ex rel. L.M. , supra . It is not the duty of the state to prove its case beyond a reasonable doubt, by clear and convincing evidence, or to disprove every hypothesis of innocence. State ex rel. L.B. , supra ; State ex rel. L.M. , supra .
It is well settled that an appellate court cannot set aside a trial court's findings of fact in the absence of manifest error or unless those findings are clearly wrong. In re A.J.F. , 2000-0948 (La. 6/30/00), 764 So.2d 47 ; State ex rel. L.M. , supra . In a manifest error review, it is important that the appellate court not substitute its own opinion when it is the trial court that is in the unique position to see and hear the witnesses as they testify. Id. Where there is conflicting testimony, reasonable evaluations of credibility and reasonable inferences of fact should not be disturbed upon review, even when the appellate court may feel that its own evaluations and inferences are as reasonable as those of the trial court. Id. ; See also Rosell v. ESCO , 549 So.2d 840 (La. 1989). If the trial court's findings are reasonable in light of the record reviewed in its entirety, the appellate court may not reverse, even though convinced that had it been sitting as the trier of fact, it would have weighed the evidence differently. In re A.J.F. , supra ; State ex rel. L.M. , supra . See also Pinsonneault v. Merchants & Farmers Bank & Trust Co. , 2001-2217 (La. 4/3/02), 816 So.2d 270.
Our review of the record reveals that the state filed a petition to adjudicate the children in need of care alleging as follows:
***
3.
The state alleges that the minors are in need of care because of the following acts or omissions:
A.
Petitioner has information and is of the belief that the above named minor child[ren are] suffering from physical abuse due to the actions of the father, in that he caused cuts and/[or] bruises to his minor child.
B.
Petitioner has information and is of the belief that the above named minor children are suffering from dependency, in that the father was incarcerated for injuries to his minor child and the mother tested positive for illegal drugs.
***
The trial court was able to review documentary evidence regarding the circumstances surrounding the state's decision to request an adjudication that the children were in need of care. The report prepared by the DCFS investigator included statements made by the father and the minor children. In his statement to the DCFS
*136 investigator and in his brief to this Court, the father admitted that he struck the victim repeatedly with at least one belt because she disobeyed him. Further, the victim sustained multiple "red welts" to her lower extremities and expressed thoughts of suicide due, in part, to the father's treatment of her. The two younger children witnessed the incident and also reported that they had been subjected to "whippings" from the father and that they were afraid of him. The marks and/or bruises noted on the victim's legs and thighs were observed by the school counselors and the DCFS investigator. Additionally, when these proceedings commenced, the father had been arrested on charges of cruelty to a juvenile and, soon thereafter, the mother tested positive for illegal drugs. Accordingly, we find no manifest error in the juvenile court's findings of fact or its conclusion that the children were in need of care.
The father also contends the juvenile court erred in placing the children in the custody of the mother. He argues that he was denied the opportunity to complete his case plan because DCFS would not assist him in paying for family counseling and batterer's intervention. He maintains that the trial court refused to order the state to pay for the programs on his behalf.
La. Ch. C. art. 681 provides:
A. In a case in which a child has been adjudicated to be in need of care, the child's health and safety shall be the paramount concern, and the court may:
(1) Place the child in the custody of a parent or such other suitable person on such terms and conditions as deemed in the best interest of the child including but not limited to the issuance of a protective order pursuant to Article 618.
***
(5) Make such other disposition or combination of the above dispositions as the court deems to be in the best interest of the child.
La. Ch. C. art. 702 provides, in pertinent part:
***
C. The court shall determine the permanent plan for the child that is most appropriate and in the best interest of the child in accordance with the following priorities of placement:
(1) Return the child to the legal custody of the parents within a specified time period consistent with the child's age and need for a safe and permanent home. In order for reunification to remain as the permanent plan for the child, the parent must be complying with the case plan and making significant measurable progress toward achieving its goals and correcting the conditions requiring the child to be in care.
***
G. When reunification is determined to be the permanent plan for the child, the court shall advise the parents that it is their obligation to achieve the case plan goals and correct the conditions that require the child to be in care within the time period specified by the court. Otherwise, an alternative permanent plan for the child will be selected and a petition to terminate parental rights may be filed. When adoption is the permanent plan for the child, the court will advise the parent of his authority to voluntarily surrender the child and to consent to the adoption prior to the filing of a petition to terminate parental rights.
***
K. In any permanency hearing for a child whose permanent plan is placement in the least restrictive, most family-like alternative permanent living arrangement, the court or administrative body conducting the hearing shall ask *137 the child about the desired permanency outcome for the child.
More than simply protecting parental rights, our judicial system is required to protect the children's rights to thrive and survive. State in Int. of S.M. , 1998-0922 (La. 10/20/98), 719 So.2d 445 ; State in Int. of C.S. , 49,955 (La. App. 2 Cir. 3/18/15), 163 So.3d 193 ; State in Int. of P.B. , 49,668 (La. App. 2 Cir. 12/17/14), 154 So.3d 806. Mere cooperation by a parent is not the sole focus of the evaluation of a permanency plan. Rather, the courts must assess whether the parent has exhibited significant improvement in the particulars that caused the state to remove the children from the parent's care and custody. Stability in the home environment and relationships is a consideration in the permanency plan determination. A parent who professes an intention to exercise his or her parental rights and responsibilities must take some action in furtherance of the intention. State in Int. of P.B. , supra .
To reverse a trial court's permanency plan determination, an appellate court must find from the record that the trial court's finding is clearly wrong or manifestly erroneous. State in Int. of C.S. , supra . In a manifest error review, it is important that the appellate court not substitute its own opinion when it is the juvenile court that is in the unique position to see and hear the witnesses as they testify. State in Int. of N.C. , 50,446 (La. App. 2 Cir. 11/18/15), 184 So.3d 760 ; State in Int. of P.F. , 50,931 (La. App. 2 Cir. 6/22/16), 197 So.3d 745.
In the instant case, the record reveals that the children were placed in the custody of their mother, who had demonstrated substantial compliance with her case plan. By placing the children with their mother, the juvenile court utilized the first dispositional alternative listed in La. Ch. C. art. 681, i.e. , "place the child in the custody of a parent[.]"
Additionally, at every review hearing, the father was informed of the aspects of the case plan with which he was not in compliance: (1) the failure to attend supervised visits with the children; (2) the failure to make financial contributions to the support of the children while they were in the custody of DCFS; (3) the failure to attend family therapy sessions; and (4) the failure to complete a batterer's intervention program. Instead, the father repeatedly expressed that DCFS should be required to pay for the programs since the agency required him to complete them. The trial court made repeated attempts to persuade the father to complete his case plan and to seek legal counsel from the indigent defender board. Despite the father's complaints that he did not fully understand the nature of the proceedings, he refused to accept or obtain legal counsel and opted to represent himself.
We have reviewed this record in its entirety. As stated above, in October 2016, these children were removed from the father's home and placed in DCFS custody due to allegations of abuse by the father. Both parents had 18 months to complete their individual case plans. By April 2018, the mother had completed her case plan, had demonstrated that she could provide for the care of her children, and had maintained her sobriety. Conversely, the father had not completed batterer's intervention and family therapy, had not visited the children (with DCFS's knowledge or supervision) since December 2016, and had not financially contributed to the children's care since they were placed in DCFS custody. Accordingly we find that the trial court did not err in finding that it was in the best interest of the children that they be placed in the custody of the mother.
*138 The father also contends the trial court erred in failing to award him specified periods of visitation with his children. This argument has merit.
It is well settled that a parent has a constitutionally protected liberty interest in establishing and maintaining a meaningful relationship with his or her children. State in Int. of A.C. , 1993-1125 (La. 1/27/94), 643 So.2d 719, cert. denied , 515 U.S. 1128, 115 S.Ct. 2291, 132 L.Ed.2d 292 (1995) ; State in Int. of MTS , 49,630 (La. App. 2 Cir. 1/14/15), 161 So.3d 1025 ; State in Int. of ASW , 49,310 (La. App. 2 Cir. 6/25/14), 144 So.3d 1193. This parental interest includes the companionship, care, custody and management of his or her children. Lassiter v. Dept. of Social Svcs. , 452 U.S. 18, 101 S.Ct. 2153, 68 L.Ed.2d 640 (1981) ; State in Int. of MTS , supra ; State in Int. of J.M.L. , 47,201 (La. App. 2 Cir. 4/11/12), 92 So.3d 447.
The best interest of the child is the sole criterion for determining a noncustodial parent's right to visitation. Lucky v. Way , 51,706 (La. App. 2 Cir. 9/1/17), 245 So.3d 110, 129, writ denied , 2017-1657 (La. 10/27/17), 228 So.3d 1233 ; Cooper v. Cooper , 43,244 (La. App. 2 Cir. 3/12/08), 978 So.2d 1156. The trial court has the inherent power to determine a child's best interest and to tailor custody orders, including visitation, in a manner that minimizes risk of harm to the child. Id.
We first note that the written judgment is silent as to the father's visitation rights with the children. However, on the record, the court expressly declined to order specified periods of visitation in favor of the father, stating that visitation would be left to the sole discretion of the mother.
Our review of the record reveals that during the last hearing, counsel for the children stated that the children had expressed a desire to visit with the father. However, the trial court dismissed DCFS from this matter and left the specific terms of visitation to the mother's discretion. As stated above, the court stated, "They're basically yours now, ma'am. You get to decide who they go visit. You get to decide when they visit, where they visit, and all of those kinds of things." Thereafter, the court advised the father to file a petition in civil court to obtain visitation.
As noted above, the record reflects that neither DCFS nor the children's attorney objected to the father exercising visitation with the children. The trial court's failure to award specific visitation rights to the father (and sole guardian of the children for more than seven years) was, in effect, a termination of the father's parental rights. This record does not support such a harsh remedy for the father's inaction.
We find that the trial court erred in failing to rule on the paramount issue of whether visitation with the father was in the best interest of the children. Consequently, we reverse the trial court's determination that visitation in favor of the father shall be left solely to the mother's discretion. We remand this matter to the trial court with instructions to conduct a hearing and make a determination of whether visitation with the father is in the best interest of the children, and if so, to order specified periods of visitation with the children in favor of the father.
CONCLUSION
For the foregoing reasons, we affirm the trial court's adjudication that the children were in need of care and its award of custody to the mother. We reverse the portion of the judgment that left the father's visitation with the children to the sole discretion of the mother, and we remand this matter with instructions to the trial court to conduct a hearing to determine whether visitation with the father is *139 in the best interest of the children, and if so, to order specified periods of visitation in favor of the father.
AFFIRMED IN PART; REVERSED IN PART; REMANDED WITH INSTRUCTIONS.

The oldest child and the middle child have the initials "A.A." For clarity, the oldest child will be referred to as "the victim" throughout this opinion.

The DCFS report described the encounter as follows: the father threw the victim onto her bed, sat on her, placed his left arm around her neck and repeatedly struck her with two belts held together; the victim was struggling and kicking as the father was attempting to strike her on her buttocks; as a result, she was struck on her legs and thighs; and the victim had five "red welts," approximately 2.5 inches wide, on her lower extremities.
The father was arrested and charged with cruelty to a juvenile. However, the criminal charges are not a subject of this appeal.

The victim was admitted to a local hospital under a physician's/coroner's emergency certificate. She was later transferred to an inpatient behavioral health facility for adolescents.

Both of the victim's sisters witnessed the incident that morning and were able to describe it in detail. The father's girlfriend was also in the house at the time of the incident. She stated that she heard the victim "talking back" and being disrespectful to the father, but she did not see the physical altercation.

A protective order had been issued prohibiting all interactions between the father and the victim. Additionally, the trial court suspended visits between the father and A.W. "until further notice."

The mother was required to attend weekly visits at the caregiver's home. The remaining visits were once a month at the mother's home under the supervision of DCFS.

Many events transpired while the children were in DCFS custody. By May 2017, only A.W. remained in the home with the maternal relative with whom she and A.A. had been placed. A.A. was removed from the home at the relative's request and was placed in the home of a foster parent in Kilbourne, Louisiana. Approximately one week later, she was removed from that home and placed in a group home in Natchitoches, Louisiana. While in the group home, A.A. was arrested twice and charged with simple battery for fighting.
In April 2017, the victim attempted to commit suicide and was admitted to a behavioral health facility. Thereafter, she was placed in a group home. Since then, she has had multiple admissions to various facilities for mental health issues and attempts to harm herself.

In August 2017, the mother had a positive drug screen. However, she was able to demonstrate that she had a prescription for hydrocodone because of a dental issue.

The father was supposed to visit with A.W. during family counseling. However, he attended only one counseling session during these proceedings. Further, the father ceased supervised visits with A.A. in December 2016.

The father's reasons for not completing counseling and batterer's intervention varied: he refused to attend the first program to which DCFS referred him; he stated that the second program to which he was referred would not accept his private insurance; he stated that the third program "conflicted with his work schedule"; he stated that he could not afford to pay for the program that was willing to adapt to his work schedule. The father rejected DCFS's suggestion that he find a program that would accept his private insurance. He also blamed the family therapist for failing to schedule appointments. According to the father, he informed the therapist that he could not afford to pay for weekly sessions. Thereafter, the therapist "only scheduled one" appointment.

The father stated that he had been giving the children money and buying them items. He also stated that he been driving to central Louisiana to visit A.A. "once or twice a month" and he had been visiting A.W. at her school without DCFS's knowledge or supervision.

The trial court was referring to Attorney Bobby Manning, who frequently represents fathers in DCFS matters through the indigent defender board. Mr. Manning had been appointed to represent the father in the early stages of these proceedings.

Apparently, the mother's October 2017 drug screen indicated that she tested positive for marijuana. However, the DCFS employee informed the trial court that the drug testing facility had made a mistake and that the mother's drug screen was actually negative.

According to the foster care supervisor, the victim continued to reside in a group home. During a weekend visit with the mother, the victim contacted DCFS via the department's social media page and reported that she did not want to live with the mother. The victim also stated that she "wanted to do Independent Living" because the mother's "house was nasty, the tub was not clean, and the lights were off." A DCFS worker immediately went to the mother's home and discovered that the victim's allegations were untrue. The mother reported that the victim was "upset" because the mother had been "getting onto her" and "trying to tell her right from wrong."

The father appears in this appeal pro se and he has filed a brief which does not fully comply with the requirements of Rule 2-12.4. Recognizing the father's pro se status, this Court has attempted to ascertain the substance of his arguments and treat them as properly raised.

A CINC proceeding is commenced by a petition filed by the district attorney. When authorized by the court, the DCFS may file a petition if there are reasonable grounds to believe that the child is a CINC. See La. Ch. C. art. 631. See also State in Int. of E.M. , 51,511 (La. App. 2 Cir. 6/2/17), 224 So.3d 1122.
Within 60 days after a child enters the custody of a child care agency, the custodian shall develop a case plan detailing the custodian's efforts toward achieving a permanent placement for the child. See La. Ch. C. art. 673. The case plan shall be designed to achieve the least restrictive, most family-like, and most appropriate setting available, and in close proximity to the parents' homes, consistent with the best interest and special needs of the child. The health and safety of the child shall be the paramount concern in the development of the case plan. See La. Ch. C. art. 675.
If, at any point in CINC proceedings, the child is removed from his parents' care and control and placed in the custody of the DCFS, the case review process of La. Ch. C. arts. 687 -700 is implemented. The custodial agency shall file a case review report with the court or, if appropriate, with the administrative review body ten days prior to every scheduled review hearing. See La. Ch. C. art. 688. A review hearing shall be conducted by the court or administrative review body three months after the disposition hearing if the child was removed prior to disposition or within six months after the disposition hearing if the child was removed at disposition, but in no case more than six months after removal of the child from his parent(s). Case reviews shall continue to be held at least once every six months thereafter until the child is permanently placed, or earlier upon the motion of a party for good cause shown or on the court's own motion. La. Ch. C. art. 692.